HARMONT PLAZA, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7767-73.    Filed July 24, 1975.

*Ronald G. Galip* and *Donald DeSalvo,* for the petitioner.
*Larry L. Nameroff,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in the Federal income tax of Harmont Plaza, Inc., as follows: [1]

---

[1] On Mar. 1, 1971, petitioner signed Internal Revenue Service Form 870 with respect to its fiscal years ended Nov. 30, 1966, and Nov. 30, 1967, and additional deficiencies were assessed with respect to those years, in the amounts of $10,440.12 and $12,155.68, respectively. On Aug. 5, 1971, petitioner filed an Application For Tentative Refund From Carryback Of Net Operating Loss. These adjustments are reflected in respondent's notice of deficiency.

| FYE Nov. 30— | Deficiency |
|---|---|
| 1967 | $27,081.92 |
| 1968 | 12,208.84 |
| 1970 | 11,067.93 |
| 1971 | 369.58 |

In the statutory notice which gave rise to this action, the respondent added to petitioner's taxable income for each of the years ended November 30, 1970, and November 30, 1971, an amount with respect to depreciation of $965.92. Petitioner concedes the correctness of this adjustment. The sole issue remaining for decision is whether petitioner is required to accrue under section 451(a), I.R.C. 1954, the amounts of $138,729 and $354 for the fiscal years ending November 30, 1970, and November 30, 1971, respectively, as rent due under a lease agreement with Sears, Roebuck & Co. The deficiencies for the fiscal years ending November 30, 1967, and November 30, 1968, result from respondent's disallowance of a net operating loss sustained in the fiscal year ending November 30, 1970, which petitioner carried back to the aforementioned years. Accordingly, the 1967 and 1968 deficiencies depend on our determination with respect to the $138,729 of rental income for the fiscal year ending November 30, 1970.

## FINDINGS OF FACT

Certain facts have been stipulated and are so found.

Petitioner is an Ohio corporation which had, at all times material to this action, its principal place of business in Youngstown, Ohio. Its United States corporate income tax returns, Forms 1120, for the taxable years ending November 30, 1967, November 30, 1968, November 30, 1970, and November 30, 1971, were filed with the Internal Revenue Service Center at Covington, Ky. Petitioner maintained its books and records and filed its income tax returns on the accrual method of accounting.

On June 1, 1955, the Austin Co., as landlord, entered into a lease agreement (hereinafter Sears lease) with Sears, Roebuck & Co. (hereinafter Sears), as tenant, with respect to two parcels of land located in Youngstown, Ohio. In pertinent part, the Sears lease contained the following provisions:

## LEASE

1. THIS AGREEMENT is made as of June 1, 1955 between THE AUSTIN COMPANY, an Ohio Corporation, hereinafter called Landlord, and SEARS,

ROEBUCK AND CO., a New York Corporation, hereinafter called Tenant. The parties agree as follows:

2. Landlord leases to Tenant and Tenant rents from Landlord the premises (hereinafter sometimes called the leased premises) situated in Youngstown, Mahoning County, Ohio, consisting of two parcels of land, located and described, respectively, as follows:

PARCEL A: the premises situated on the easterly side of Market Street between Florida Avenue and Indianola Avenue, shown in red outline on the plot plan attached hereto, marked Exhibit A, signed by Landlord and Tenant and made a part hereof; said parcel being divided by Hylda Street, a public street.

PARCEL B: the premises situated in the city block bounded by Southern Boulevard, Brooklyn Avenue, Cottage Grove and Avondale Avenue, shown in red outline on the plot plan attached hereto, marked Exhibit B, signed by Landlord and Tenant and made a part hereof.

TOGETHER with the retail store buildings and improvements on Parcel A and the warehouse building and other improvements on Parcel B to be erected and made by Landlord, as hereinafter provided.

\* \* \*

5. The term of this lease shall be forty (40) years, commencing on the date upon which Tenant's store on the leased premises is opened for the conduct of business. Within fifteen (15) days after such store opening, Landlord and Tenant will execute and deliver a supplemental agreement hereto fixing the beginning and ending dates of the term. For convenience, the 40 year term is sometimes called the *basic term* and any period or periods for which this lease may be extended is called the *extended term.*

\* \* \*

30. Tenant shall have the right to assign this lease or sublet the leased premises, or any part thereof, for any lawful purpose, or to vacate the leased premises; provided, however, that Tenant shall remain responsible for the payment of rent, as hereinafter provided, and for the performance of Tenant's other obligations hereunder, in no event, however, beyond the original term or any extended term to which Tenant has agreed in writing.

31. If Tenant assigns this lease or sublets all or substantially all of the leased premises, or if Tenant vacates said premises, the rent payable under this lease, in lieu of all minimum and additional rent hereinbefore provided, shall be $14,584 (Fourteen Thousand Five Hundred Eighty-Four Dollars) per month; provided, however, that if thereafter Tenant re-occupies the leased premises and operates Tenant's business therein, Tenant shall thereupon resume payment of the minimum and additional rent hereinbefore provided; and provided further, that if Tenant so assigns or sublets at a monthly rent in excess of that provided for in this paragraph, Tenant will pay such excess to Landlord.

32. If Tenant vacates the leased premises, Landlord shall make every reasonable effort to re-let the same for the best rent obtainable. If the rent received by Landlord from such re-letting, after deducting the cost of advertising and broker's commission, if any, equals or exceeds the rent payable by Tenant under paragraph 31, Tenant shall not be liable to pay such rent. If the rent received by Landlord from such re-letting, after such deductions, is less than said rent payable by Tenant, Tenant shall be liable only for the deficiency.

* * *

47. In each lease year of the basic term Tenant will pay to Landlord as rent for the leased premises an amount equal to 2½% of Tenant's net sales made during such lease year up to $8,500,000, plus 1¼% of the next $2,000,000 of net sales, plus 1% of net sales over $10,500,000. Such rent shall be payable within 20 days after the end of each quarter of such lease year, based on the net sales made during such quarter. (The above figures are, respectively, two and one-half percent, eight and one-half million, one and one-quarter percent, two million, one percent, ten and one-half million, and twenty.)

On May 2, 1963, the Austin Co. transferred its interest in the Sears lease to the trustees of Shopping Centers Investment Trust. Subsequently, on November 29, 1966, the trustees of Shopping Centers Investment Trust assigned its interest in the Sears lease to the petitioner, Harmont Plaza, Inc.

Petitioner is 90-percent owned by William M. Cafaro. It is one of approximately 50 real estate (primarily shopping centers) enterprises controlled by William M. Cafaro or the Cafaro family interests. The Cafaro interests also owned undeveloped real estate in Boardman, Ohio, part of which was contiguous to property owned by Edward J. DeBartolo (hereinafter DeBartolo). To effectuate the development of the Boardman property as a regional shopping mall and to preclude competition between the Cafaro and DeBartolo interests, a new corporation, Southern Park, Inc., was created. Southern Park, Inc., is an Ohio corporation, beneficially owned 65 percent by Edward J. DeBartolo and 35 percent by the children of William M. Cafaro.

On May 1, 1968, Sears, Roebuck & Co., Southern Park, Inc., and Edward J. DeBartolo entered into the following lease assumption agreement regarding the Sears lease:

### LEASE ASSUMPTION AGREEMENT

THIS AGREEMENT, made this first day of May, 1968, between SEARS, ROEBUCK AND CO., a New York Corporation, (hereinafter called "Sears"), SOUTHERN PARK, INC., an Ohio Corporation (hereinafter called "Southern Park"), and EDWARD J. DeBARTOLO, an individual, of Youngstown, Ohio, (hereinafter called "DeBartolo"),

WITNESSETH:

WHEREAS, of even date herewith, Southern Park, as Landlord and Sears, as Tenant, are entering into a lease for a retail store, an outdoor sales area, and an automotive service center, in Southern Park's development located at the southeast corner of the intersection of Route U.S. 224 and Route 7, Boardman Township, Ohio, and

WHEREAS, DeBartolo owns controlling interest in Southern Park's parent corporation, and

WHEREAS, on June 1st, 1955, Sears, as tenant, entered into a lease with The Austin Company as landlord, for a retail store building, an auto service center, and a garden shop, which buildings are presently occupied by Sears under the terms of said lease dated June 1st, 1955, said buildings being located in the City of Youngstown, Ohio, which lease was subsequently assigned by The Austin Company to Shopping Centers Investment Trust, and subsequently assigned to Harmont Plaza Inc., the present landlord of said lease dated June 1st, 1955, and

WHEREAS, Sears, as a condition to entering into said lease of even date herewith, are requiring Southern Park and DeBartolo to assume Sears' liability under the terms of said lease dated June 1st, 1955.

NOW, THEREFORE, in consideration of the execution of said lease of even date herewith, it is agreed as follows:

1. Southern Park and DeBartolo hereby agree to assume Sears' obligation as tenant under said lease dated June 1st, 1955, as assigned, and as may have been amended or supplemented.

2. Said assumption by Southern Park and DeBartolo shall become effective on the date that the term commences under said lease dated May 1st, 1968.

3. Sears agrees to release and discharge DeBartolo from the assumption of said lease dated June 1st, 1955 at such time as the Cash Flow of Southern Park shall equal or exceed Three Hundred Thousand and 00/100 Dollars ($300,000.00) per year.

4. In the event Southern Park or DeBartolo are able to negotiate with the landlord for the cancellation of said lease dated June 1st, 1955, at no cost to Sears, Sears agrees to consent to said cancellation and execute such documents as are necessary to complete the cancellation.

5. The parties hereto agree to enter into such documents as shall be necessary in order to carry into full force and effect the agreements hereto entered into.

IN WITNESS WHEREOF, the parties have executed this agreement the day and year first above written.

| Signed in the presence of: | SEARS, ROEBUCK AND CO. |
|---|---|
| (S) Robert W. McConnell, Jr. | By (S) [illegible] |
| | *Assistant to the Vice-President* |
| | SOUTHERN PARK, INC. |
| (S) Edith Arquilla | By (S) Edward J. DeBartolo |
| | EDWARD J. DEBARTOLO, *President* |
| (S) [illegible] | By (S) Robert J. Schreiber |
| | ROBERT J. SCHREIBER, *Secretary* |

Thereafter, on May 9, 1968, a supplemental agreement was entered into between the Edward J. DeBartolo Corp., Edward J. DeBartolo, individually, Anthony M. Cafaro (the son of William M. Cafaro), and William M. Cafaro, with respect to the development, construction, and operation of a retail shopping center on the Boardman property to be known as Southern Park. In pertinent part, the provisions of this supplemental agreement are as follows:

## SUPPLEMENTAL AGREEMENT

THIS AGREEMENT, made this 9th day of May, 1968, by and between THE EDWARD J. DeBARTOLO CORPORATION, of 7620 Market Street, Youngstown, Ohio (hereinafter referred to as "DeBartolo"), EDWARD J. DeBARTOLO, Individually, and ANTHONY M. CAFARO AND WILLIAM M. CAFARO, of 2445 Belmont Avenue, Youngstown, Ohio (hereinafter sometimes collectively referred to as "Cafaro"),

WITNESSETH:

WHEREAS, The Edward J. DeBartolo Corporation and Anthony M. Cafaro, of even date herewith, are entering into an agreement to form a corporation to engage in the development, construction, and operation of a retail shopping center to be known as "Southern Park", (hereinafter referred to as "Said Agreement"), and the parties hereto desire to set forth herein certain additional understandings and agreements,

NOW, THEREFORE, in consideration of the presents and the mutual covenants of the parties hereinafter set forth, IT IS AGREED as follows:

1. LAND FINANCING

The purchase price in the amount of Two Million Two Hundred Eighty-Four Thousand Three Hundred Fifty-Three and 00/100 Dollars ($2,284,353.00) to be paid by the corporation being formed under the terms of Said Agreement, (hereinafter referred to as the "Corporation"), to Anthony M. Cafaro as set forth in Paragraph 5 of Said Agreement shall be paid as follows:

(A) Assumption by the Corporation of the mortgages set forth on Exhibit "G" of Said Agreement, all of said mortgages having a remaining principal balance of One Hundred Eighteen Thousand Five Hundred Sixty-Two and 73/100 Dollars ($118,562.73).

(B) Assumption by the Corporation of a note from The Cleveland Trust Company in the approximate principal amount of Two Million Two Hundred Thousand and 00/100 Dollars ($2,200,000.00) with one half of the principal due February, 1969, and the balance due February, 1970, with interest at the rate of six and one-half percent (6½%) per annum.

(C) The balance, if any, shall be evidenced by an unsecured note of the Corporation with interest at the rate of six and one-half percent (6½%) per annum, payable to Anthony M. Cafaro, which note shall be due and payable five (5) years from the date thereof, however, the Corporation shall pay said note sooner if funds are available from financing or from cash flow, as hereinafter set forth.

In the event the assumptions provided for above exceed the purchase price to Cafaro, such excess amount shall be immediately paid by Cafaro to the Corporation at the time of the payment of said Cleveland Trust note. Cafaro warrants and represents that the terms of the mortgages as set forth on Exhibit "G" attached to Said Agreement are true and correct. It is understood and agreed that the Corporation shall be required to assume said Cleveland Trust note as above set forth, however, the Corporation shall not be required to furnish any security for the payment of said note. It is understood and agreed that neither Anthony M. Cafaro, nor William M. Cafaro shall be required to furnish any money to the Corporation except for the stock subscription price payable by Anthony M. Cafaro as provided for in Said Agreement.

The purchase price in the amount of Eight Hundred Ninety-Six Thousand Five Hundred and 00/100 Dollars ($896,500.00) to be paid by the Corporation to DeBartolo as set forth in Paragraph 5 of Said Agreement shall be paid as follows:

(A) Assumption of a mortgage to The Mahoning National Bank in the principal amount of Three Hundred Fifty Thousand and 00/100 Dollars ($350,000.00).

(B) Assumption of the mortgage to The Home Savings and Loan Company on Lot #9 in the principal amount of Two Thousand Seven Hundred Forty-Seven and 53/100 Dollars ($2,747.53).

(C) The balance of the purchase price shall be evidenced by a promissory note of the Corporation with interest at the rate of six and one-half percent (6½%) per annum, payable to DeBartolo. The terms of said note shall provide for payment of five (5) years from the date thereof, however, the Corporation shall pay said note sooner if funds are available from financing or from cash flow as hereinafter set forth.

The Corporation shall have the right to borrow land, construction, and permanent financing, including any second mortgages, in such amounts, for such terms, and for such security as the officers of the Corporation determine.

\* \* \*

3. COMPETITION AGREEMENT

[This paragraph sets forth noncompetition provisions among all four parties.]

4. LEASE COMMITMENTS

Exhibit "A" attached hereto is a list of lease commitments which have been made by Cafaro. DeBartolo agrees to contact all of such tenants set forth on Exhibit "A" and agrees to use his best efforts to consummate leases with said tenants for the proposed mall shopping center. In the event leases are not consummated with any one or more of the tenants listed, the parties hereto agree to cause the Corporation to indemnify Cafaro from any losses incurred by reason of the failure to consummate a lease in accordance with the terms set forth on Exhibit "A" attached hereto. [Not included herein.]

\* \* \*

6. LEASE INDEMNITY

DeBartolo controls the ownership of buildings known as the Greater Boardman Shopping Center and which includes as tenants J. C. Penney Company, Inc. and The May Department Stores Company. Cafaro controls the ownership of Harmont Plaza Inc., an Ohio Corporation which owns the buildings leased to Sears, Roebuck and Co. in Youngstown, Ohio, known as the Main Sears Store Building, the Sears Auto Service Center, the Sears Garden Shop, and the Sears Warehouse. The parties hereto contemplate that all three of such tenants shall be tenants in the new enclosed mall shopping center and in order to conclude such leases, the parties agree that it will be necessary to cancel all of the existing leases with said tenants. The parties hereto agree that the Corporation shall indemnify DeBartolo for all loss of rental by reason of cancellation of the said lease with J. C. Penney Company, Inc. and The May Department Stores Company, and shall indemnify Cafaro and Harmont Plaza Inc. against all loss of rental by reason of cancellation of said lease with Sears, Roebuck and Co. The parties hereto agree to use their best efforts to re-let on

the best terms available and as quickly as possible the premises being vacated by said tenants, so as to minimize the amount of the net loss of rental. In the event such premises are re-let, the Corporation shall be liable only for the amount of the net loss of rental, if any. The net loss of rental shall equal the amount of rental less the amount the premises can be re-let for after first deducting the cost of re-letting, including any necessary repairs and/or alterations to such premises in order to accomplish such re-letting.

In determining the amount of the loss of rental to DeBartolo pertaining to The May Department Stores Company, the base amount shall be the minimum rental currently payable by The May Department Stores Company in the amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) per annum, and pertaining to J. C. Penney Company, Inc., the base amount shall be the average of the annual rental paid by J. C. Penney Company, Inc. for the five full lease years immediately preceding the date of this Agreement. In determining the amount of loss of rental to Cafaro and Harmont Plaza Inc. under the Sears, Roebuck and Co. lease, the base amount shall be the average of the annual rental paid by Sears, Roebuck and Co. for the five full lease years immediately preceding the date of this Agreement. It is understood that Sears, Roebuck and Co. has agreed to enter into a long term lease of at least thirty (30) years of the warehouse at an annual rental of Fifty-Four Thousand Dollars ($54,000.00) with Cafaro or Harmont Plaza, Inc., and that the proceeds of said lease shall be applied to the reduction of the loss of rental of the other Sears facilities.

Cafaro and Harmont Plaza, Inc. agree to use their best efforts to sell the above referred to Sears property so as to minimize the obligation of the Corporation under the terms to be reasonably approved by all of the parties to this Agreement.

7. PRIORITY OF CASH FLOW

The cash flow of the Corporation shall be paid out in accordance with the following priority:

(A) The management fee

(B) Reasonable reserve to cover possible increase in expenses such as real estate taxes.

(C) For the payment of any unpaid land

(D) For any unpaid fees permitted under the terms of Said Agreement exclusive of the construction profit fee

(E) For the lease indemnity as provided for in paragraph 6 of this Agreement. In the event there is not sufficient cash flow to cover all of the lease indemnities, sixty-five percent (65%) of the amount of cash flow available after payment of (A), (B), (C), and (D) above shall be paid to DeBartolo and the balance of thirty-five percent (35%) of all such cash flow available after payment of (A), (B), (C), and (D) above shall be paid to Cafaro and Harmont Plaza Inc.

(F) The three percent (3%) construction profit fee

(G) Distribution to stockholders in proportion to the amount of stock ownership.

This Agreement shall inure to the benefit of and be binding upon the heirs, successors and assigns of the parties hereto.

In Witness Whereof, the parties have executed this instrument the day and year first above written at Youngstown, Ohio.

THE EDWARD J. DeBARTOLO CORPORATION

By      (S) Edward J. DeBartolo
          EDWARD J. DeBARTOLO, *President*

By      (S) Robert J. Schreiber
          ROBERT J. SCHREIBER, *Secretary*

          (S) Edward J. DeBartolo
          EDWARD J. DeBARTOLO

          (S) William M. Cafaro
          WILLIAM M. CAFARO

          (S) Anthony M. Cafaro
          ANTHONY M. CAFARO

Southern Park, Inc., proceeded with the development and construction of the Southern Park mall. By the end of 1969 the mall was substantially completed, although not fully leased, and open to the general public. The Cafaro interests did not become involved in the management of Southern Park, Inc.; they held only a 35-percent stock interest in the corporation.

Subsequently, on June 30, 1970, the petitioner, Harmont Plaza, Inc., Sears, Roebuck & Co., Southern Park, Inc., the Edward J. DeBartolo Corp., Edward J. DeBartolo, individually, Anthony M. Cafaro, and William M. Cafaro entered into the following agreement regarding the prior agreements, *supra:*

### AGREEMENT

THIS AGREEMENT made this 30th day of June, 1970, by and between HARMONT PLAZA, INC., an Ohio Corporation, hereinafter referred to as "HARMONT", SEARS, ROEBUCK & CO., a New York Corporation, hereinafter referred to as "SEARS", SOUTHERN PARK, INC., an Ohio Corporation, hereinafter referred to as "SOUTHERN PARK", THE EDWARD J. DeBARTOLO CORPORATION, an Ohio Corporation, hereinafter referred to as "DeBARTOLO CORPORATION", EDWARD J. DeBARTOLO, an Individual, of Youngstown, Ohio, hereinafter referred to as "DeBARTOLO", and ANTHONY M. CAFARO and WILLIAM M. CAFARO, Individuals of Youngstown, Ohio, hereinafter referred to as "CAFARO."

### WITNESSETH:

WHEREAS, SEARS did let and lease from the Austin Company by Lease dated June 1, 1955, hereinafter sometimes referred to as "Said Lease", premises situated in the City of Youngstown, Mahoning County, Ohio, consisting of two (2) percels [sic] of land located and described respectively as follows:

PARCEL A: the premises situated on the easterly side of Market Street, between Florida Avenue and Indianola Avenue, said parcel being divided by

Hylda Street, which land is more fully described on Exhibit "A", attached hereto and made a part hereof by reference;

PARCEL B: the premises situated in the city block bounded by Southern Boulevard, Brooklyn Avenue, Cottage Grove and Avondale Avenue, which land is more fully described on Exhibit "B", attached hereto and made a part hereof by reference;

together with the retail store buildings and improvements on Parcel A and the warehouse building and other improvements on Parcel B; and

WHEREAS, HARMONT has succeeded to the interest of the Austin Company under said Lease and HARMONT and SEARS have entered into a Memorandum of Lease dated July 22, 1968, recorded in Mahoning County records in Volume 148 at Page 282, and

WHEREAS, DeBARTOLO CORPORATION, CAFARO and DeBARTOLO entered into a Supplemental Agreement, hereinafter referred to as "Supplemental Agreement", dated May 9, 1968, whereby, among other things, it was provided SOUTHERN PARK would indemnify CAFARO and HARMONT against all loss of rental as a result of SEARS relocating from the above referenced Parcel A or Parcel B premises to premises in the Southern Park Mall, Boardman, Ohio; and

WHEREAS, SEARS, SOUTHERN PARK and DeBARTOLO have entered into an agreement dated May 1, 1968, hereinafter referred to as "Lease Assumption Agreement", whereby SOUTHERN PARK and DeBARTOLO have assumed SEARS liability under the terms of Said Lease under terms and conditions as more specifically set forth in said Lease Assumption Agreement; and

WHEREAS, SEARS has vacated the premises referred to as Parcel A above but are still in occupancy of the premises referred to as Parcel B above; and

NOW THEREFORE, in consideration of the mutual covenants herein contained the parties agree as follows:

1. It is agreed by HARMONT, DeBARTOLO, DeBARTOLO CORPORA-TION, SOUTHERN PARK and CAFARO that the indemnification for loss in rental from Parcels A and B, as contained in the Supplemental Agreement, is limited to One Hundred Seventy-Nine Thousand Two Hundred Twenty-Nine and 00/100 Dollars ($179,229.00) per year.

2. SEARS, SOUTHERN PARK, CAFARO, DeBARTOLO and DeBARTOLO CORPORATION hereby approve the Leasing by HARMONT to Treasure Island Department Stores of Youngstown, Inc., hereinafter referred to as "Treasure Island", the Parcel A premises and the improvements thereon, without any of said parties being released from any liability under Said Lease or the Lease Assumption Agreement or the Supplemental Agreement. The Lease with said Treasure Island shall be in the form attached hereto as Exhibit C and made a part hereof by reference. The parties specifically acknowledge that Said Lease provides for an annual minimum rent of One Hundred Thirty-Five Thousand and 00/100 Dollars ($135,000.00) with provision for two (2) months free rental (Article 4 of Exhibit C) and a credit against the third month's rental of Six Thousand and 00/100 Dollars ($6,000.00) (Article 33 of Exhibit C) and for a term ending February 28, 1981, as well as two (2) five-year renewal options.

3. DeBARTOLO, CAFARO, DeBARTOLO CORPORATION and SOUTHERN PARK hereby consent and approve the reletting of the Parcel B premises referred to above from HARMONT to SEARS for a term of thirty (30) years commencing October 13, 1969, and ending October 12, 1999, at an annual rental of Forty Thousand Five Hundred and 00/100 Dollars ($40,500.00) without being released from liability under the terms of the Supplemental Agreement.

4. HARMONT represents it has not received any income on the Parcel A premises since October 13, 1969, on which date SEARS vacated said premises. For purposes of accounting and establishing the indemnity obligation of SOUTHERN PARK, said parties agree that an annual period ending each September 30th will be used and that following each September 30 commencing with September 30, 1970, HARMONT shall submit to SOUTHERN PARK, a statement certifying the amount, if any, by which the rental income received by HARMONT during the prior annual period was less than One Hundred Seventy-Nine Thousand Two Hundred Twenty-Nine and 00/100 Dollars ($179,229.00). If rental income exceeds said figure the certification shall so state. If the rental income received is less than said figure, the difference between the rental income received and One Hundred Seventy-Nine Thousand Two Hundred Twenty-Nine and 00/100 Dollars ($179,229.00) shall be payable by SOUTHERN PARK to HARMONT within thirty (30) days after date of such certification subject to the priority of cash flow as provided in said Supplemental Agreement.

5. HARMONT agrees that it will not amend or modify the lease with Treasure Island in any manner which would extend the term of Said Lease or reduce the rental income without first obtaining the consent of SEARS, SOUTHERN PARK, DeBARTOLO and DeBARTOLO CORPORATION.

6. Except as herein supplemented or amended, DeBARTOLO, DeBARTOLO CORPORATION, SOUTHERN PARK and CAFARO reaffirm their respective obligations under the Supplemental Agreement of May 9, 1968, and the Lease Assumption Agreement.

This Agreement shall bind and inure to the benefit of the parties hereto, their respective heirs, successors and assigns.

IN WITNESS WHEREOF, The parties hereto have executed this Agreement as of the day and year first above written.

| Signed in the presence of: | HARMONT PLAZA, INC. |
|---|---|
| (S) Georgiane Cooper | By (S) William Cafaro |
| (S) Janice Lynn Good | By (S) [illegible] |
| | SEARS, ROEBUCK & CO. |
| (S) [illegible] | By (S) [illegible] |
| | *Assistant to the Vice President* |
| (S) [illegible] | (S) Robert W. McConnell, Jr. |
| | *Assistant Counsel* |
| Signed in the Presence of: | SOUTHERN PARK, INC. |
| (S) Edith Arquilla | By (S) Edward J. DeBartolo |
| | EDWARD J. DEBARTOLO, *President* |

| | |
|---|---|
| (S) Dorothy E. Lewis | By    (S) Arthur D. Wolfcale |
| | ARTHUR D. WOLFCALE, *Secretary* |
| | THE EDWARD J. DeBARTOLO |
| | CORPORATION |
| (S) Edith Arquilla | By    (S) Edward J. DeBartolo |
| | EDWARD J. DEBARTOLO, *President* |
| (S) Dorothy E. Lewis | By    (S) Arthur D. Wolfcale |
| | ARTHUR D. WOLFCALE, *Secretary* |
| (S) Edith Arquilla | (S) Edward J. DeBartolo |
| | EDWARD J. DEBARTOLO |
| (S) Janice Lynn Good | (S) Anthony M. Cafaro |
| | ANTHONY M. CAFARO |
| (S) Georgiane Cooper | (S) William M. Cafaro |
| | WILLIAM M. CAFARO |

After October 13, 1969, when Sears vacated parcel A, petitioner received no further rental payments from Sears for parcel A. (Parcel A was subsequently relet to Treasure Island Department Stores of Youngstown, Inc., at an annual minimum rent of $135,000.) Parcel B was relet by petitioner to Sears at a fixed annual rental of $40,500. Under the terms of the June 30, 1970, agreement, *supra,* petitioner's right to indemnification for rental loss was limited to $179,229. The amount of net rental loss actually incurred by petitioner for its taxable years ended November 30, 1970, and November 30, 1971, with respect to the Sears lease was $138,729 and $354, respectively. Petitioner did not report these amounts on its income tax returns for fiscal 1970 or 1971. Neither Sears nor DeBartolo nor Southern Park, Inc., has, to any extent, compensated petitioner for this rental loss. As provided in the supplemental agreement of May 9, 1968, *supra,* the indemnification liability of Southern Park, Inc., was subordinated to certain prior claims on the cash flow of Southern Park, Inc. As of the date of trial, these priorities amounted to approximately $6½ or $7 million dollars. From its inception, Southern Park, Inc., has not generated a positive cash flow.

OPINION

The basic issue remaining for our determination is whether petitioner, Harmont Plaza, Inc., must accrue under section 451(a), I.R.C. 1954,[2] for the fiscal years ended November 30, 1970, and November 30, 1971, the amounts of $138,729 and $354, respectively, which represent the amount of net rental loss

---

[2] All references are to the Internal Revenue Code of 1954, unless otherwise specified.

incurred by petitioner under its lease with Sears as a result of Sears vacating the leased property to move to Southern Park. As a threshold matter, we must ascertain to whom petitioner must look for payment; that is, whether Sears remained the primary obligor as it was under the original 1955 lease agreement or whether Southern Park, Inc., became primarily liable by virtue of the various agreements executed by Sears, the DeBartolo interests, and the Cafaro interests in 1968 and 1970. Resolution of this question rests on whether William M. Cafaro, an officer, director, and 90-percent shareholder of petitioner, was acting on behalf of petitioner in the Supplemental Agreement of May 9, 1968, and whether petitioner, by joining in the Agreement of June 30, 1970, acknowledged a substitution of obligors, to the extent that petitioner was in fact obliged to look to Southern Park, Inc., for indemnification in the event of rental loss.

Respondent points to the fact that the petitioner, Harmont Plaza, Inc., was not a party to either the Lease Assumption Agreement of May 1, 1968, or the Supplemental Agreement of May 9, 1968, and contends that William M. Cafaro was a party to the latter exclusively in his individual capacity. Accordingly, respondent concludes that petitioner was not bound by these agreements and in no way thereunder released Sears from liability. We do not, however, accord such significance to the fact that petitioner was not formally made a party to either of the May 1968 agreements. Instead, on the basis of the evidence adduced at trial and the provisions of the Supplemental Agreement and the Agreement of June 30, 1970, we conclude that William M. Cafaro was acting on behalf of both petitioner and the Cafaro interests in entering into these agreements. Our conclusion comports with what appears to be both the general practice with respect to the Cafaro interests and the specific intent of the parties to those agreements, as well as some of the provisions of the agreements themselves.

The interests of William M. Cafaro and his family comprised approximately 50 various individual, corporate, and other entities engaged, for the most part, in real estate operations. Petitioner's principal witness, who was an officer and director of petitioner and an officer or director of all the other Cafaro companies, not only testified that William M. Cafaro often acted on behalf of his corporations but also repeatedly referred to "the Cafaro Companies," "Harmont Plaza, Inc.," "we," and "the

Cafaro interests" interchangeably. The following exchange at trial serves to illustrate this functional and economic equivalence:

Q Was any agreement reached with respect to the Sears property on Market Street?

A Yes, it was agreed that the—that Sears would be allowed to vacate but I don't think that Harmont—I don't think that we, Harmont Plaza, Inc. or the Cafaro or Mr. William Cafaro had any way of stopping that from happening and still we thought that, you know, to—it would be to the advantage of Harmont Plaza, Inc. and Cafaro—William Cafaro to allow Sears to vacate because the possibilities then were still very good of improving greatly the financial position of Harmont Plaza, Inc.

At a later point, in clarifying that the Cafaro Co. to which he had referred was a recently formed corporation, the witness added, "And when I refer to the Cafaro Company, I am sort of, you know, using this term to include all of the corporations controlled by Mr. William Cafaro and his children in trust, or however it may be."

The documents themselves further evidence the congruity of interest between William M. Cafaro and the petitioner, Harmont Plaza, Inc. We turn, for example, to paragraph 6 of the Supplemental Agreement of May 9, 1968, which contains the lease indemnity provisions. As a prefatory matter, the parties specifically note that "Cafaro controls the ownership of Harmont Plaza, Inc., an Ohio corporation which owns the buildings leased to Sears, Roebuck and Co. in Youngstown, Ohio" thereby establishing the identity of interest between petitioner and Cafaro. This identity is explicitly confirmed by the fact that the key indemnification language provides "The parties hereto agree that the Corporation [Southern Park, Inc.] shall indemnify * * * *Cafaro and Harmont Plaza, Inc.* [emphasis added] against all loss of rental by reason of cancellation of said lease with Sears, Roebuck and Co." notwithstanding the fact that Cafaro, in an individual capacity, was not party to the Sears lease and could not, therefore, technically suffer any rental loss. Similarly, the parties further provided in paragraph 6:

In determining the amount of loss of rental to *Cafaro and Harmont Plaza, Inc.* under the Sears, Roebuck and Co. lease, the base amount shall be the average of the annual rental paid by Sears, Roebuck and Co. for the five full lease years immediately preceding the date of this Agreement. * * * [Emphasis added.]

and

*Cafaro and Harmont Plaza, Inc.* agree to use their best efforts to sell the above referred to Sears property so as to minimize the obligation of the Corporation under the terms to be reasonably approved by all of the parties to this Agreement. [Emphasis added.]

The inclusion of Harmont Plaza, Inc., which was not formally a party to the Supplemental Agreement, in the latter excerpt further evidences Cafaro's intention and capacity to represent petitioner therein. These references to both Cafaro and petitioner admit of no other reasonable interpretation than that advanced by petitioner; that is, William M. Cafaro was acting on behalf of petitioner with the result that petitioner was bound by the Supplemental Agreement to look to Southern Park, Inc., for indemnification in the event of rental loss.

In addition we think it is clear that by joining in the Agreement of June 30, 1970, to which Sears, Harmont, and all others interested were parties, Harmont acknowledged and ratified the substitution of Southern Park, Inc., as the party to whom it should first look for reimbursement of any rental loss resulting from Sears vacating a part of the Youngstown property. That agreement not only makes reference to all of the prior documents relating to the ownership and leasing of the Youngstown property, but is directed entirely toward "accounting and establishing the indemnity obligation of SOUTHERN PARK" for any loss of rental suffered by Harmont as a result of Sears' move from Harmont Plaza to Southern Park. See par. 4 of the agreement. That paragraph also provides that annually Harmont shall submit to Southern Park a statement certifying the amount by which the rental actually received during the preceding year was less than the minimum rental under the Sears lease and that amount "shall be payable by SOUTHERN PARK to HARMONT within thirty (30) days after date of such certification subject to the priority of cash flow as provided in said Supplemental Agreement."

Respondent, however, directs us to paragraphs 2 and 5 of the June 30, 1970, agreement in support of his contention that petitioner neither was party to the Supplemental Agreement of May 9, 1968, nor released Sears as primary obligor under the Sears lease. Focusing more closely upon the pertinent language of paragraph 2:

2. SEARS, SOUTHERN PARK, CAFARO, DeBARTOLO and DeBARTOLO CORPORATION hereby approve the Leasing by HARMONT to Treasure Island Department Stores of Youngstown, Inc., hereinafter referred to as "Treasure Island", the Parcel A premises and the improvements thereon, without any of said parties being released from any liability under Said Lease or the Lease Assumption Agreement or the Supplemental Agreement. * * *

we conclude instead that this provision, by reference to "Said Lease" (the original Sears lease), the Lease Assumption Agreement, and the Supplemental Agreement, recognizes and re-affirms the indemnification liability of Southern Park, Inc. Sears is mentioned therein because of its underlying liability as lessor in the original lease, and we agree, as does petitioner on brief, that Sears was not released from that liability. However, the emphasis throughout the document points to Southern Park, Inc., as the primary obligor for any loss of rental. If Sears had remained primary obligor, it would clearly have been an interested party with respect to the indemnification limitation in paragraph 1; but Sears was not a party to that agreement. Viewed in this light, the language of paragraph 5:

5. HARMONT agrees that it will not amend or modify the lease with Treasure Island in any manner which would extend the term of Said Lease or reduce the rental income without first obtaining the consent of SEARS, SOUTHERN PARK, DeBARTOLO and DeBARTOLO CORPORATION.

serves as an additional acknowledgment by Harmont Plaza, Inc., that it must look first to Southern Park, Inc., and then to Sears only in the event that Southern Park, Inc., fails to satisfy its indemnification liability.

In sum, the Lease Assumption Agreement, the Supplemental Agreement, and the Agreement of June 30, 1970, evince an overall plan of the Cafaro and DeBartolo interests to effectuate the development of the Southern Park Mall whereby petitioner, as a condition for Sears' participation in Southern Park, acceded to the substitution of Southern Park, Inc.'s indemnification obligation as the primary source of payment.

Having ascertained that petitioner was required to first look to Southern Park, Inc., for payment of the $138,729 and $354 rental loss for fiscal 1970 and 1971, respectively, we must now examine the effect of this indemnification agreement on petitioner's right to receive rental or indemnification for the loss thereof and to determine whether that right satisfied the requisites for accrual under section 451(a) and the regulations

648

thereunder.[3]Specifically, the issue is whether petitioner possessed a fixed, rather than contingent, right to receive the above payments and if so, whether there nevertheless existed in either of the respective fiscal years sufficient doubt as to collectibility so as to preclude accrual.

As to the first question, it is well settled that accrual is predicated on the existence of a fixed right to receive income rather than actual receipt. *Spring City Co. v. Commissioner*, 292 U.S. 182 (1934); *Commissioner v. Hansen*, 360 U.S. 446 (1959); *Schlude v. Commissioner*, 372 U.S. 128 (1963). Accordingly, where the right to receive is contingent, accrual is not proper, *Lucas v. North Texas Co.*, 281 U.S. 11 (1930). Petitioner contends that accrual of the indemnification payments is unwarranted because under the Supplemental Agreement its right to receive such payments is conditioned upon: (1) Southern Park, Inc., operating with a net cash flow and (2) the cash flow priority schedule set out in paragraph 7. Given the fact that Southern Park, Inc., has from its inception had a deficit cash flow, petitioner would have us conclude that the first criterion not having been satisfied, its right remains contingent and unaccruable.

We disagree, however, with petitioner's characterization of the net cash flow and priority specifications; neither rises to the dignity of what has hitherto been recognized as a contingency sufficient to vitiate the "fixed" requirement of section 451(a). See *Lucas v. North Texas Co., supra.* Unlike specific conditions precedent of performance under a mortgage service contract as in *Guarantee Title & Trust Co. v. Commissioner*, 313 F. 2d 225 (6th Cir. 1963), reversing a Memorandum Opinion of this Court (T.C. Memo. 1961-122), or the relinquishment of a right to interest until the debtor's repayment of a specified Reconstruction Finance Corporation loan, *Standard Lumber Co.*, 35 T.C. 192 (1960), affd. on another issue 299 F. 2d 382 (9th Cir.

---

[3] Sec. 451(a), I.R.C. 1954:

* * * The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

Sec. 1.451-1 General rule for taxable year of inclusion.

(a) *General rule.* * * * Under an accrual method of accounting, income is includible in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. * * *

1962), together they are more realistically the incidents of actual receipt rather than the right itself. Instead, we analogize the cash flow and priority schedule provisions to the general subordination characteristic of the ordinary corporate capital structure which, although an index of the prospects of payment, clearly does not of itself preclude corporate creditors from acquiring a fixed right within the meaning of section 451.

Moreover, examination of the key documents (the Lease Assumption Agreement, the Supplemental Agreement, and the Agreement of June 30, 1970), indicates that petitioner accepted Southern Park, Inc., as the primary but not sole obligor. Not only is there no evidence that Sears was completely released from liability but in its reply brief petitioner admits that:

In fact, Petitioner has taken the position that Sears has not been released from liability but that the liability of Sears has been conditioned and qualified; that Sears is only secondarily liable to Harmont; that Harmont must first look to Southern Park, Inc.; * * * [Petitioner's reply brief, p. 7.]

We agree with this statement of the relations between the parties. In permitting Southern Park, Inc.'s indemnification obligation to supercede the rental liability of Sears, petitioner has certainly affected when it might receive payment to the extent that the cash flow and priority provisions countenance the possibility of delay in actual receipt but has in no way diminished its underlying right to receive.[4] The law is clear that postponement of payment alone does not defer accrual. *Commissioner v. Hansen, supra; Georgia School-Book Depository, Inc.,* 1 T.C. 463 (1943). At most, all petitioner agreed to was a possible postponement of payment of the rent it already had the fixed right to receive.

Notwithstanding our determination that the indemnification liability of Southern Park, Inc., accorded petitioner the requisite fixed right to receive the amounts in issue, it remains for us to further ascertain whether the cash flow and priority schedule factors rendered payment sufficiently doubtful so as to warrant nonaccrual. Where income is of doubtful collectibility or it is reasonably certain that it will not be collected, a taxpayer is

---

[4] Petitioner and Sears apparently entered into a lease dated Oct. 13, 1969, covering parcel B of Harmont Plaza. We would assume that that document would make some reference to the then relationship of petitioner and Sears under the original lease, but the document was not offered in evidence.

justified in not accruing the item. *Corn Exchange Bank v. United States,* 37 F. 2d 34 (2d Cir. 1930).

We note, however, that this exception has typically been applied where the debtor is insolvent or in fact bankrupt. In the *Corn Exchange Bank* case, *supra,* for example, the debtor from whom interest was owing was in receivership. The mere financial difficulty of the debtor or the fact that a lapse of time is contemplated before actual satisfaction is possible does not constitute the requisite doubtful collectibility. *Commercial Solvents Corp.,* 42 T.C. 455 (1964); *Automobile Ins. Co. v. Commissioner,* 72 F. 2d 265 (2d Cir. 1934). Applying these principles to petitioner's case, we find the deficit cash flow of Southern Park, Inc., insufficient to establish the degree of financial instability necessary to invoke the exception to accrual. There is no evidence that in 1970 and 1971 petitioner could not ultimately expect payment. Particularly in the context of leveraged real estate transactions, initial cash flow deficits cannot be considered accurate indices of financial viability. Indeed, it often takes several years before the operation "turns around" and generates a positive cash flow. It should be noted further that cash flow is not a constant but a factor which is subject to variation by Southern Park, Inc., itself and, therefore, not reliable as a true barometer of financial conditions. We take a similar view of the priority schedule and do not regard the buildup of priorities incurred in the development of a large retail shopping center like Southern Park as a basis for establishing financial instability.

In sum, neither the existence of a deficit cash flow nor the priority schedule precludes petitioner's right to indemnification payments. We draw support from our analysis in *Georgia School-Book Depository, Inc., supra,* where, in concluding that the taxpayer could reasonably expect payment from the State even though the income in question was payable only from revenue generated by a recently enacted excise tax on beer, we noted that:

despite the condition of the treasury of the State of Georgia when the free schoolbook fund was inaugurated and for several years thereafter, there was no reasonable expectation that the sums owed by the state to petitioner's publishers and, consequently, the commissions to petitioner itself, would not ultimately be paid. It would naturally take a few years to establish in full working order a system of such magnitude * * * [1 T.C. at 470-471.]

We, therefore, do not find it necessary to reach the question of whether to prevent accrual because of doubtful collectibility, there must be actual insolvency of the debtor which renders payment improbable (see *Jones Lumber Co. v. Commissioner,* 404 F. 2d 764 (6th Cir. 1968), affg. a Memorandum Opinion of this Court). On the basis of the record before us, we hold that in 1970 and 1971 petitioner had a fixed right to receive rent or indemnification therefor from Southern Park, Inc., as to which there existed no justifiable doubt of collectibility in 1970 and 1971. Accordingly, petitioner is required to accrue in fiscal 1970 and 1971 the respective amounts of $138,729 and $354.

*Decision will be entered for the respondent.*