DEAUVILLE OPERATING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deauville Operating Corp. v. Commissioner
Docket No. 12955-79.
United States Tax Court
T.C. Memo 1985-11; 1985 Tax Ct. Memo LEXIS 621; 49 T.C.M. (CCH) 464; T.C.M. (RIA) 85011; January 8, 1985. *621 Petitioner had leased a hotel to a partnership (lessee).In November of 1975 petitioner and the partnership terminated the lease, and petitioner released the partnership from all of its obligations under the lease. As of December 31, 1975, petitioner had accrued, but unpaid, rent receivables due from the partnership. Petitioner also had an accounts receivable account for its other hotel operations. Petitioner used the reserve method to determine its bad debt expense. For the short taxable year ended November 30, 1975, the partnership (lessee) incurred a loss. An additional $20,557 of partnership losses was allocated to petitioner when it was determined that the partners who were entitled to those losses could not utilize them. Petitioner held a 40-percent interest in the partnership. Held, petitioner properly accrued rental income for 1975. Held further, petitioner failed to prove that its rent receivables became worthless and is not entitled to a bad debt deduction. Held further, petitioner was not entitled to the additional partnership losses. Held further, respondent did not abuse his discretion in disallowing part of petitioner's addition to its bad debt *622 reserve. Steven S. Brown, for the petitioner. Michael B. Axman, for the respondent. *623 STERRETT MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated August 2, 1979, respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ended December 31, 1972 and December 31, 1975 in the amounts of $66,174.22 and $18,200.00, respectively. The issues before us are: (1) whether petitioner reported excessive rental income in the amount of $701,667; (2) whether petitioner is entitled to a bad debt deduction of $151,250; (3) whether petitioner is entitled to an additional partnership loss of $20,557; and (4) whether respondent abused his discretion in disallowing part of petitioner's addition to its bad debt reserve. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioner is a corporation with its principal office at 4041 Collins Avenue, Miami, Florida. Petitioner filed its corporate income tax returns for the years 1972 and 1975 with the office of the Internal Revenue Service, Holtsville, New York. Prior to March 1957, petitioner built *624 the Deauville Hotel, which is located in Miami Beach, Florida. In March 1957, petitioner leased the Deauville Hotel. The original lease agreement set the rent obligation at $1,350,000 per year, and the lease term was to end on September 30, 1977.In 1958 the annual rental for the hotel was reduced to $1,330,000, payable in monthly installments of $110,833.33. A security deposit of $1,500,000 was required from the lessees. On April 9, 1957 the lessees of the Deauville Hotel formally entered into a partnership for the purpose of leasing and operating the hotel. The partnership agreement provided that each partner was to participate in the profits and losses according to their respective partnership interests. [1] Under the agreement, the partners could be required to provide additional capital to meet partnership rent obligations. The agreement also set forth how much each partner had to contribute towards the security deposit. While $1,500,000 was required as a security deposit, the actual money contributed by the partners and retained by petitioner was $1,348,750 (i.e., $151,250 less than the required $1,500,000 *625 amount). The reason for this shortage is twofold. First, four partners each paid in $56,250 towards the security deposit and they were required to each contribute $75,000. Second, $76,250 of the contributed security deposit was refunded to two partners. With the exception of petitioner, the other members of the partnership and the partnership's CPA were not aware of these underpayments and refunds. Thus, at all times the partnership books showed a balance of $1,500,000 in the security deposit asset account. At all relevant times, petitioner and the partnership were on the accrual method of accounting. For all years prior to 1975, petitioner had annually accrued rental income in the amount of $1,330,000 and the partnership and deducted the same amount annually as an accrued rental expense. The partnership, however, did not make all the required rental payments to petitioner. As of December 31, 1974 petitioner's books showed accrued, but unpaid, rent receivables due from the partnership of $1,551,666. In the following year, numerous events occurred on November 24, 1975. Petitioner and the partnership entered into an agreement to terminate the lease, effective at *626 12:00 midnight on November 30, 1975. Under the agreement, the partnership was to transfer all of its assets, including the security deposit, to petitioner. Petitioner agreed to assume all of the partnership liabilities and to release the partnership from all obligations, including, but not limited to, the lease agreement obligations. Accordingly, petitioner and the partnership executed general releases to each other. Lastly, the partners of the Deauville Hotel executed a Dissolution of the Partnership. Under the dissolution agreement, the partnership released the partners from all obligations and/or rights enforceable against them. For the partnership's short taxable year ended November 30, 1975 petitioner accrued rental income of $1,219,167 (11 months at the stated rental) and the partnership deducted the same amount as an accrued rental expense. The partnership paid petitioner $720,416 toward the accrued rent in 1975. After these transactions, petitioner's balance in its rent receivable account was $2,050,417. [2]
*627 On December 31, 1975 an adjusting journal entry was made on petitioner's books to reflect the transfer of the partnership's assets to petitioner. By virtue of this adjusting entry, the partnership was credited $550,417 towards the rent due to petitioner, reducing petitioner's rent receivables to $1,500,000 (i.e., $2,050,417 less the credit of $550,417). [3] Finally, petitioner credited the rent receivables for the security deposit in the incorrect amount of $1,500,000. Since the security deposit amount was really $1,348,750, a balance of $151,250 actually remained in petitioner's rent receivables. *628 For the short taxable year ended November 30, 1975 the partnership allocated petitioner a partnership loss of $397,055. On its corporate income tax return for the year ended December 31, 1975, however, petitioner deducted $548,305 as its loss from the partnership's operations. [4] The difference in these two amounts is $151,250. On September 21, 1976 petitioner filed an application to carry back its 1975 net operating loss to 1972. Petitioner claimed and was allowed a refund for 1972. The year 1972 is included in the instant case due to petitioner's carryback to 1972 of this net operating loss. The partnership subsequently increased petitioner's share of partnership losses $20,557 to $417,612. This increase represented partnership losses originally allocated to three other partners by the CPA who prepared the partnership's tax returns. The CPA did not realize that these partners had a zero basis in their respective partnership interests and hence could not utilize these losses. When he became aware of this fact, he reallocated the losses to petitioner. *629 The partnership agreement provided that profits and losses were to be allocated to the partners according to their respective interests in the partnership. Under this agreement, petitioner was allocated a partnership loss of $397,055 for 1975. The record is void of any evidence showing that a special allocation agreement was entered into between the partners to allocate an additional $20,557 loss to petitioner. Petitioner also had an accounts receivable account for its hotel operations (i.e., renting out of rooms to tourists, etc.). Instead of writing off the portion of receivables as a bad debt expense when they became uncollectible, petitioner used the reserve method to determine its bad debt expense. For the years prior to 1975, the percentage petitioner applied against its total receivables to arrive at the addition to its reserve was one percent. For 1975 petitioner applied a percentage of three percent against its total receivables to arrive at its claimed addition to its bad debt reserve. Petitioner's CPA testified that the general economic conditions in Miami Beach and in the travel industry in 1975 justified the increase in percentage. He did not, however, mention any *630 specific instances where petitioner had trouble collecting on its receivables. In his statutory notice of deficiency, respondent determined that the distributive share of partnership loss reported on petitioner's return should be decreased as follows: Partnership loss reported on return
$548,305
Petitioner's distributed share
307,055
Overstatement of partnership loss
$151,250
Respondent maintains that the amount of $151,250 did not constitute an allowable loss because it represented capital contributions required to be made by several members of the partnership and deposited with petitioner as rental security which petitioner failed to collect. In the statutory notice of deficiency respondent also determined that the bad debt reserve reported on petitioner's return should be decreased by $11,285. OPINION The first issue to decide is whether petitioner's accrual of $701,667 in rental income in 1975 was proper. [5] Petitioner argues that accrual of this amount was improper because, as of the termination of the lease at midnight on November 30, 1975, it was clear that the partnership would be unable to pay its full rent for 1975. Petitioner places *631 emphasis on the fact that the termination of lease agreement provided that petitioner was to assume all the assets and liabilities of the partnership as of November 30, 1975, and that the partnership's liabilities exceeded their assets on that date. [6] In addition, pursuant to the termination of lease agreement, petitioner had given the partnership a general release from liability. Under the accrual method of accounting, income is includable in gross income when all the events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Section 1.451-1(a), Income Tax Regs. *632 The right to receive and not the actual receipt determines the accrual of income unless, when the right arises, there exists a reasonable doubt with respect to its collectibility. Jones Lumber Co. v. Commissioner,404 F.2d 764, 766 (6th Cir. 1968); Harmont Plaza, Inc. v. Commissioner,64 T.C. 632, 649-650 (1975), affd. 549 F.2d 414 (6th Cir. 1977); Western Oaks Building Corp. v. Commissioner, 49 T.C.. 365, 372 (1968). This exception to the general rule of accrual should be applied narrowly so that the exception does not swallow up the rule. Georgia School-Book Depository, Inc. v. Commissioner,1 T.C. 463, 469 (1943). The critical question becomes when did petitioner's right to the rental income arise. The lease agreement required annual rent of $1,330,000, payable in monthly installments of $110,833.33. As performance under the lease agreement occurred during the year, it could be determined with reasonable accuracy how much rental income petitioner had earned. Thus, generally rent, like interest, accrues from day to day, ratably over time. Hence, termination of the lease as of midnight *633 on November 30, 1975 was subsequent to petitioner's right to receive the first 11 months of rent for 1975. The fact that petitioner gave the partnership a general release from liability is irrelevant. Petitioner's cancellation of the accrued rental income does not prevent its inclusion in gross income. Philad Co. of Delaware v. Commissioner,47 B.T.A. 565, 569 (1942). Subsequent uncollectibility of the rent becomes a question of whether petitioner is entitled to a deduction for worthless debts. This issue is not changed by the fact that the claimed loss relates to an item of gross income which had accrued in the same year. Spring City Foundry Co. v. Commissioner,292 U.S. 182, 185 (1934). Petitioner next argues that it is entitled to an additional $151,250 loss from partnership operations. We fail to see how this amount can reflect a loss from partnership operations. Petitioner, as the landlord, simply failed to collect $151,250 in rent from the partnership which it had previously, properly, accrued as income. If petitioner is to be entitled to a deduction for the $151,250, it must turn, as suggested above, to section 166(a)[7] *634 and show that the failure to collect that sum qualifies as a deductible bad debt. To be entitled to a bad debt deduction under section 166(a), three essential requirements must be met: (1) there must be a valid debt; (2) it must be ascertained to be worthless within the taxable year; and (3) it must be charged off within the taxable year. Petitioner failed to prove that the rent receivable account became worthless in 1975. While petitioner did show that the partnership was insolvent as of November 30, 1975, and had been delinquent in making rental payments, these facts alone do not establish that the debt was worthless. Higginbotham-Bailey-Logan Co. v. Commissioner,8 B.T.A. 566, 570, 580 (1927). Petitioner had the burden of showing that steps it took to collect the debt and what information and other circumstances existed which led it to believe the debt was worthless. Magnon v. Commissioner,73 T.C. 980, 1000 (1980). *635 In the instant case, petitioner did not make an effort to collect the unpaid rent from the partnership. This is surprising because, while the partnership was possibly insolvent, the partnership had a right to require additional capital contributions from its partners to satisfy rental obligations. Despite petitioner's 40-percent interest in the partnership, this right was never exercised. Petitioner failed to establish that its rent receivables in the amount of $151,250 became worthless in 1975, and petitioner's voluntary cancellation of the rental obligation and forgiveness of the indebtedness will not give rise to a bad debt deduction. [8]Estate of Liggett v. Commissioner,216 F.2d 548, 550 (10th Cir. 1954); Roth Steel Tube Co. v. Commissioner,68 T.C. 213, 221 (1977), affd. 620 F.2d 1176 (6th Cir. 1980); Cimarron Trust Estate v. Commissioner, 59 T.C.. 195, 199 (1972). *636 Petitioner next claims that it is entitled to an additional $20,557 loss from partnership operations. This claim is without merit. This amount represents losses originally allocated to three partners and later reallocated to petitioner when it was determined that the three partners had a zero basis in their respective partnership interests and could not utilize the losses. Petitioner does not contend that the losses were given to him pursuant to a special allocation agreement, nor does the record suggest that any special allocation agreement existed between the partners. Rather, the partnership agreement provided that profits and losses were to be allocated to the partners according to their respective interests in the partnership.Under this agreement, petitioner was allocated a partnership loss of $397,055 for 1975 and is not entitled to an additional $20,557 loss. See section 704(a). The final issue for our resolution is whether respondent abused his discretion by disallowing part of petitioner's addition to its reserve for bad debts for the taxable year ended December 31, 1975. *637 Section 166(c) permits, at the Commissioner's discretion, a deduction for a reasonable addition to a reserve for bad debts instead of deducting specific debts which become worthless within the taxable year. A bad debt reserve is essentially an estimate of future losses which can reasonably be expected to result from debts outstanding at the close of the taxable year. Valmont Industries, Inc. v. Commissioner,73 T.C. 1059, 1067 (1980); Handelman v. Commissioner,36 T.C. 560, 565 (1961). What is a reasonable addition to the reserve is determined in light of the facts existing at the close of the taxable year of the proposed addition. The primary focus is on the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. Section 1.166-4(b)(1), Income Tax Regs.
In disallowing a portion of petitioner's addition to its reserve, respondent applied the 6-year moving average formula approved by this Court in Black Motor Co. v. Commissioner,41 B.T.A. 300, 303-304 (1940), *638 affd. on another issue, 125 F.2d 977 (6th Cir. 1942). [9] The Black Motor formula is an arithmetic average of the taxpayer's total receivables and bad debt losses during 6 previous years. It is an attempt to ascertain a "reasonable" addition to a bad debt reserve in light of the taxpayer's recent charge-off history. Respondent's determination of what is a reasonable addition carries great weight because of the discretion vested in him under section 166(c). The burden placed upon taxpayers under section 166(c) is greater than that needed to overcome the presumption of correctness attaching to the ordinary notice of deficiency. Therefore, petitioner must show that its addition to its bad debt reserve was reasonable and that respondent's action in disallowing the addition was arbitrary and an abuse of discretion. Thor Power Tool Co. v. Commissioner,439 U.S. 522, 548 (1979); Valmont Industries, Inc. v. Commissioner,supra at 1067. Petitioner proffered *639 evidence in the form of testimony by Mr. Levinson, petitioner's CPA, as to changing economic conditions in the area and in the travel industry. Petitioner sought to demonstrate that its application of a percentage of three percent against its total receivables to arrive at its claimed addition to its bad debt reserve was reasonable. Petitioner also attempted to show that respondent abused his discretion by using past bad debt experience in determining the addition to the bad debt reserve. Petitioner contends that the economic climate and related circumstances as of the end of 1975 in Miami Beach justify than an amount in excess of what respondent allowed be added to petitioner's reserve for bad debts. Petitioner only offered generalizations as to the prevailing economic conditions. [10] That is insufficient to meet his burden of proving reasonableness of his method of calculating the addition to his reserve for bad debts. Imperial Type Metal Co. v. Commissioner,106 F.2d 302, 304 (3d Cir. 1939). Furthermore, testimony as to changing economic conditions is too speculative a factor in this case to overcome petitioner's heavy burden of proving that respondent's *640 computation was unreasonable and arbitrary. Atlantic Discount Co. v. United States,473 F.2d 412, 415 (5th Cir. 1973). Accordingly, we find that petitioner has failed to meet its burden of proof under section 166(c). Decision will be entered for the respondent.
Footnotes
1. Petitioner held a 40 percent interest in the partnership.↩
2. This amount was calculated as follows: ↩
Rent receivable as of 12/31/74
$1,551,666
Accrued rent for 1975
1,219,167
$2,770,833
720,416
Less payments received
$2,050,417
3. The adjusting journal entry was received by petitioner from the partnership's CPA. No plausible explanation was given for why petitioner's rent receivables was credited $550,417. It appears that this number was used to reduce petitioner's rent receivables to $1,500,000 and correspondingly to reduce the partnership's rent payables to $1,500,000 (i.e., this figure was "plugged"). Since the partnership's CPA erroneously thought that the security deposit asset had a $1,500,000 balance, he probably believed that its application towards the remaining rent due would eliminate the amounts outstanding in petitioner's rent receivables and in the partnership's rent payables.↩
4. On petitioner's corporate income tax return for 1975, it reported a net operating loss of $122,312.↩
5. This amount represents the total of the $151,250 balance remaining in petitioner's rent receivables and the $550,417 credit to the receivables account pursuant to the adjusting journal entry. It is petitioner's contention that this credit to the receivables was erroneously made. ↩
6. Petitioner does not argue that the partnership was insolvent at any previous time when it was delinquent in making its rental payments.↩
7. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
8. We need not address respondent's alternate argument that the $151,250 did not constitute an allowable loss because it represented partner capital contributions towards the rental security deposit which petitioner failed to collect.↩
9. The validity of this formula has been upheld by the Supreme Court. See Thor Power Tool Co. v. Commisioner,439 U.S. 522↩ (1979).
10. Petitioner did not offer any evidence establishing that payment from any specific customer in 1975 was unlikely. Thus, petitioner's reliance on Calavo, Inc. v. Commissioner,304 F.2d 650↩ (9th Cir. 1962), is misplaced.