IDI MANAGEMENT, INC., AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
IDI Management, Inc. v. Commissioner
Docket No. 6830-74.
United States Tax Court
T.C. Memo 1977-369; 1977 Tax Ct. Memo LEXIS 71; 36 T.C.M. (CCH) 1482; T.C.M. (RIA) 770369; October 25, 1977, Filed William R. Seaman and Ronald E. Heinlen, for the petitioner. Conley G. Wilkerson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined the following deficiencies in petitioner's Federal income tax: Year
Deficiency
1963
$ 75,297.04
1964
1,837.35
1965
226,925.69
1966
552,921.68
1967
644,722.01
1968
1,587,827.91
1969
514,598.33
1970
403,146.00
By amended petition, petitioner claims that the net operating losses for its 1971 and 1972 taxable years are available for carryback to some of the years for which the respondent has asserted deficiencies.
The issues before us concern four longterm construction contracts executed by petitioner, a taxpayer reporting income therefrom on the completed contract basis. More particularly, we are asked to decide whether, in the year of contract completion, petitioner properly accrued in income the fair market value rather *74 than the face value of debt obligations arising from such contracts. Resolution of this issue will affect the disposition of other issues relating to bad debt deductions by petitioner in respect of the partial worthlessness of such obligations in the year of completion and in subsequent years. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. Petitioner, IDI Management, Inc. (IDI), is an Ohio corporation and had its principal place of business in Cincinnati, Ohio, at the time of the filing of the petition herein. At all times material herein, petitioner was engaged, directly and through subsidiary corporations, in the business of designing, engineering, constructing, and selling individual plant process units and complete facilities for the manufacture of agricultural chemicals used primarily for fertilizer. Petitioner and its subsidiaries filed consolidated Federal income tax returns for the 1963-1970 calendar years with the district director of internal revenue, Cincinnati, Ohio. Both petitioner and one of its subsidiaries, whose transactions are involved herein, used the accrual method of accounting.They accounted for long-term *75 construction on their own books and records by percentage of completion and they used the completed contract method of accounting for tax purposes. Reference herein to petitioner shall be deemed to refer to the subsidiary as well as IDI. On November 1, 1966, petitioner executed a long-term construction contract (#1157), effective as of June 27, 1966, pursuant to which it agreed to design and construct an addition to a fertilizer plant for St. Paul Ammonia Products, Inc. (St. Paul), at a contract price of $9,662,340. The contract called for an initial $1,000,000 payment, monthly progress payments thereafter, and final payments due on acceptance and 60 days later. Subsequently, the parties to the contract mutually agreed to eliminate a substantial portion of the expansion work called for by the contract when it appeared that St. Paul's plan of financing would not be completed as scheduled. Petitioner could not abandon the contract when St. Paul was unable to obtain financing because highly specialized construction materials had already been ordered and cancellation of such orders involved substantial costs. By October 27, 1967, St. Paul had made progress payments of only $219,639.91. *76 On that date, petitioner and St. Paul entered into a settlement agreement recognizing interest owing petitioner on past due progress payments in the amount of $248,240.34 and fixing the remaining portion of the contract price at $5,086,202.41, subject to certain additional charges which were finally determined in 1969 to be $266,690.91. Pursuant to this agreement, St. Paul delivered to petitioner: (a) an unsubordinated 7 percent demand promissory note dated October 27, 1967 for $248,240.34; (b) 490,000 shares of St. Paul common stock to be applied against the contract price at the rate of $1.00 per share, and (c) 7 percent subordinated demand construction notes in a total face amount of $4,596,202.41. In November, 1967, St. Paul paid the note for $248,240.34. At a special meeting of the shareholders of St. Paul on October 26, 1967, a general plan of refinancing of the company was approved. The plan included the foregoing settlement agreement with petitioner to be executed the following day; it recognized that the construction debt to petitioner as well as $4,700,000 of its 5-1/2 percent debentures were past due; and, it authorized $7,500,000 of new bank debt to which the construction *77 notes issued to petitioner would be subordinated. The purpose of the new debt was to pay the past due debentures and to provide new working capital. The refinancing was implemented in November, 1967. No part of the bank loan proceeds was available for payment to the petitioner other than the $248,240.34 used to pay the demand note mentioned above. To facilitate the refinancing, petitioner gave up its right under Minnesota law to file a mechanic's lien against the newly constructed plant and agreed to hold the new bank creditors harmless against any outstanding mechanic's liens, or any that might be filed in the future, in respect of facilities constructed by petitioner pursuant to its contract with St. Paul. Petitioner completed the long-term construction contract for St. Paul in 1968. In respect of past due interest on the construction notes, St. Paul issued to petitioner the following 7 percent interest-bearing demand promissory notes: Date
Face Amount
2/1/68
$ 84,620.16
5/1/68
80,792.10
8/1/68
84,013.48
11/1/68
85,495.60
2/1/69
87,003.48
5/1/69
85,651.82
Total
$507,576.64
At a special meeting of the shareholders of St. Paul on November 28, 1969, a *78 plan of recapitalization was adopted whereby common stock of St. Paul would be issued in exchange for various outstanding debts and securities of St. Paul. The effectiveness of the plan was conditioned upon the acceptance of the plan on or before February 2, 1970, by holders of 95 percent of the principal amount of St. Paul's 6 percent convertible subordinated debentures, 95 percent of the principal amount of its interim notes, and 100 percent of the construction notes (held by petitioner) with the right of St. Paul to reduce the required percentages to 75 percent. By February 2, 1970, St. Paul had received consents representing over 80 percent of the required amounts and its board of directors decided to proceed with the implementation of the plan. Pursuant to the plan, petitioner surrendered its $4,596,202.41 of St. Paul's construction notes and its $507,576.64 of St. Paul promissory notes issued in respect of past due interest in exchange for 4,203,779 shares of St. Paul common stock and a new $900,000, 7 percent subordinated construction note. At the same meeting on November 28, 1969, the St. Paul shareholders authorized the borrowing of $2,500,000 from Manufacturers Hanover *79 Trust Company (Hanover) for the construction of a 275-ton-per-day nitric acid plant. Under the terms of the new loan, Hanover would have a first mortgage lien on all assets of St. Paul, all stock or securities of St. Paul, and certain other securities owned by Continental Nitrogen and Chemicals, Inc. (Continental). [1] No part of the loan proceeds was available for payment to petitioner in respect of obligations arising from Contract #1157. On June 30, 1971, St. Paul was indebted to petitioner for unpaid interest in the amount of $364,191.18. As of that date and pursuant to the so-called Phase II of the recapitalization authorized in November 1969, petitioner exchanged such indebtedness as well as St. Paul's 7 percent note in the face amount of $900,000 for 12,641 shares of St. Paul Series A Convertible Preferred Stock. Each of the preferred shares had a par value of $100 and was convertible into 66.667 shares of St. Paul common stock at the option of the holder. St. Paul paid no cash dividends on either its common or preferred *80 stock at any time material herein. On January 6, 1967, and February 1, 1967, petitioner entered into two contracts (#1143 and #6257) with the Oklahoma Ordnance Works Authority (O.O.W.A.), an Oklahoma public trust, for the construction of a facility containing ammonia, nitric acid, and ammonium nitrate plants, related buildings, and equipment for a total price of $7,500,000. The contract price was payable partly in cash ($3,000,000) and partly in industrial revenue bonds to be issued by O.O.W.A. ($4,500,000), but such bonds were subject to a participation by O.O.W.A.. As of February 1, 1967, O.O.W.A. entered into a lease with Cherokee Nitrogen Company (Cherokee) (a wholly-owned subsidiary of Continental, the major shareholder of St. Paul prior to its recapitalization), pursuant to which Cherokee would operate the facilities constructed for O.O.W.A. by petitioner. As of July 1, 1967, petitioner entered into a long-term construction contract (#6274) with Cherokee for additional facilities to be built at the O.O.W.A. fertilizer plant, leased by Cherokee, for a price of $4,075,000. The contract price was subsequently reduced to $4,000,000. The facilities to be constructed were *81 also subject to the lease from O.O.W.A. to Cherokee. In 1968, petitioner completed its two contracts with O.O.W.A. (#1143 and #6257) as well as its contract with Cherokee (#6274). As provided by contract, O.O.W.A. paid petitioner $3,000,000 in cash and gave to petitioner $4,500,000 Series A, 6 percent Industrial Development Subordinated Revenue Bonds issued by O.O.W.A. in satisfaction of the $7,500,000 contract price. In order to make the cash payment, O.O.W.A. borrowed $2,500,000 from the First National Bank and Trust Company of Tulsa and $500,000 from The Oklahoma Industrial Finance Authority. As security for such loans, O.O.W.A. executed an indenture of mortgage, a security agreement, and an assignment of rents (due from Cherokee) in favor of each of the lenders with the First National Bank and Trust Company of Tulsa having first priority. The O.O.W.A. bonds delivered to petitioner were due July 15, 1977. Although they carried interest from date of issue, payment of interest was postponed until October 15, 1971. The bonds were subject to a $400,000 Participation Certificate giving O.O.W.A. a right to 4/45ths of the proceeds, whether principal or interest. They were secured *82 solely by the lease to Cherokee, a trust indenture, and a third mortgage of the plant leased to Cherokee, [2] but such security given was subject to the prior interests of the First National Bank and Trust Company of Tulsa and The Oklahoma Industrial Finance Authority. [3]
Upon completion of its contract (#6274) with Cherokee in 1968, petitioner booked an open account receivable from Cherokee for the full adjusted contract price of $4,000,000. On or about April 15, 1971, petitioner, Cherokee, and O.O.W.A. entered into a three-party agreement pursuant to which petitioner accepted 100 O.O.W.A. Series B Industrial Development Subordinated Revenue Bonds in the principal amount of $10,000 each in satisfaction of $1,000,000 of the open account construction contract with Cherokee. Petitioner also accepted 50,000 shares of $10 par value Cherokee common stock in satisfaction of $2,500,000 *83 of the Cherokee contract debt. On or about July 30, 1971, petitioner accepted an additional 10,000 shares of the $10 par value Cherokee common stock in satisfaction of the remaining $500,000 of the Cherokee debt. As of December 31, 1968, and December 31, 1969, the fair market values of the various debt obligations held by petitioner as a result of its contracts with St. Paul, O.O.W.A., and Cherokee were as follows: 12/31/68 Fair
Obligation
Face Value
Market Value
St. Paul 7% subordinated
$4,596,202.41
$2,000,000.00
Construction Notes
O.O.W.A. Series A, 6%
4,500,000.00
2,600,000.00
Industrial Development
Subordinated Revenue Bond
Account Receivable from
4,000,000.00
2,500,000.00
Cherokee
Total
$13,096,202.41
$7,100,000.00
12/31/69 Fair
St. Paul 7%
$900,000.00
$360,000.00
Subordinated
Construction Note
Receivable due from
266,690.57 [1]
106,676.23
St. Paul
Interest due from
244,536.18
97,814.47
St. Paul
Total
$1,411,226.75
$564,490.70
As of November 28, 1969, and *84 December 31, 1969, the fair market value of 4,203,779 shares of St. Paul common stock was $840,755.80. The 60,000 shares of Cherokee common stock that petitioner received in 1971 had a fair market value of $920,000 at the time of receipt. From 1967 to 1970, the nitrogen fertilizer industry experienced a serious imbalance in supply and demand. Although consumption increased, production increased at a higher rate due to production efficiencies effected primarily by new plant facilities in the Gulf Coast and southern regions of the country. Because of this increased supply as well as the sensitivity of demand to other market conditions, industry prices dropped sharply during this period. New production facilities enabled companies to market ammonia products at prices equal to or below St. Paul's and Cherokee's production costs. Both companies suffered during this period. St. Paul, which had been in existence for some years, curtailed its production of ammonia in 1967-1968 and purchased its ammonia needs in the market.Cherokee, which had only come into being in 1967, was experiencing a difficult start. St. Paul's June 30 fiscal year-end balance sheets for 1966 through 1973 *85 were as follows: ST. PAUL AMMONIA PRODUCTS, INC. Balance Sheets as of June 30 [1] (All footnotes not included) Assets
1966
1967
1968
1969
Current Assets: Cash and equivalent: [4]
$ 1,653,224
$ 257,528
$ 320,575
$ 594,052
Receivables: Trade Accounts
1,482,122
2,010,818
2,526,362
2,858,905
Other
8,467
802,966
708,088
114,466
2,813,784
3,234,450
2,973,371
Less allowance for
discounts, price
adjustments and doubtful
n/a
28,461
143,127
104,778
receivables
Net receivables
1,490,589
2,785,324
3,091,323
2,868,593
Inventories: Finished products
Finished and in process
93,386
868,453
1,152,043
825,593
Raw materials and
212,867
197,840
190,031
225,555
chemicals
Parts and supplies
432,665
471,199
460,753
248,088
Total Inventories
743,918
1,537,492
1,802,827
1,299,236
Prepaid expenses
54,941
63,045
66,132
157,005
Total current assets
3,942,672
4,643,388
5,280,857
4,918,886
Investment in 5.0%-owned
135,000
85,000
70,000
company
Plant and equipment, at
cost: Land
257,911
253,728
261,658
261,658
Plant and equipment
14,872,631
20,734,235
20,998,132
12,202,515
Specialized repair parts
Office and agency
208,571
254,768
254,168
257,699
buildings
Office fixtures and other
103,645
123,544
311,019
341,958
equipment
Construction in progress
66,374 [2]
1,416,984
15,442,758
21,371,275
21,891,351
14,480,814
Less allowance for
6,900,642
7,675,198
10,817,175
4,714,319
depreciation
Net plant and equipment
8,542,116
12,696,077
11,074,176
9,766,495
Deferred turnaround,
debenture, loan
and other expenses and
61,004
34,672
20,027
290,098
other assets
$12,545,792
$18,509,137
$16,460,060
$15,045,479
*86 Assets
1970
1971 [3]
1972 [3]
1973
[5]
Current Assets: Cash and equivalent: [4]
$ 536,992
$ 414,523
$ 637,079
$ 1,343,509
Receivables: Trade Accounts
2,413,532
3,016,314
2,724,862
3,1 91,767
Other
48,708
57,671
75,383
52,038
2,462,240
3,073,985
2,800,245
3,243,805
Less allowance for
discounts, price
adjustments and doubtful
200,000
162,000
117,350
106,000
receivables
Net receivables
2,262,240
2,911,985
2,682,895
3,137,805
Inventories: Finished products
Finished and in process
625,825
1,570,259
2,202,241
465,648
Raw materials and
153,749
177,386
139,624
145,212
chemicals
Parts and supplies
144,125
633,027
643,135
388,875
Total Inventories
923,699
2,380,672
2,985,000
999,735
Prepaid expenses
104,726
670,870
779,605
809,214
Total current assets
3,827,657
6,378,050
7,084,579
6,290,263
Investment in 5.0%-owned
61,000
69,000
25,922
company
Plant and equipment, at
cost: Land
264,575
645,575
639,007
638,207
Plant and equipment
12,483,294
19,316,356
19,522,318
20,720,606
Specialized repair parts
424,590
Office and agency
266,665
533,678
535,274
512,468
buildings
Office fixtures and other
318,881
707,946
726,724
695,051
equipment
Construction in progress
1,948,465
137,998
189,022
69,664
15,281,880
21,341,553
21,612,345
23,060,586
Less allowance for
5,722,806
7,286,413
8,598,349
10,134,613
depreciation
Net plant and equipment
9,559,074
14,055,140
13,013,996
12,925,973
Deferred turnaround,
debenture, loan
and other expenses and
72,015
33,166
280,359
319,935
other assets
$13,519,746
$20,535,356
$20,378,934
$19,562,093
*87 ST. PAUL AMMONIA PRODUCTS, INC. Balance Sheets as of June 30 (All footnotes not included) *88 [1]
LIABILITIES
1966
1967
1968
1969
Current liabilities
Demand notes payable to
$
$
$ 4,680,823
$ 5,103,779
construction company
Notes payable to banks
170,000
6,547,585
9,451,458
Current maturities of
2,625,721
9,922,152
32,353
1,031,424
long term debt
[2]
Accounts payable
475,872
792,077
1,224,017
2,277,877
Accrued liabilities
285,253
326,987
525,495
452,163
Advance deposits on bulk
product sales
Federal and State incomes
320,370
121,393
taxes, estimated
Total current liabilities
3,715,216
11,332,809
13,010,273
18,316,701
Long term debt
3,660,254
1,421,779
1,564,450
646,253
Deferred income taxes
802,000
1,167,000
Stockholders equity: Preferred stock
2,000,000
2,000,000
2,000,000
2,000,000
Common stock
32,813
33,938
46,188
46,188
Additional paid-in
959,138
1,093,013
1,570,763
1,570,763
capital
Accumulated earnings
1,376,371
1,460,598
(1,731,614)
(7,534,426)
(deficit)
Less treasury stock
Total stockholders equity
4,368,322
4,587,549
1,885,337
(3,917,475)
$12,545,792
$18,509,137
$16,460,060
$15,045,479
LIABILITIES
1970
1971
1972
1973
Current liabilities
Demand notes payable to
$ 900,000
$
$
$
construction company
[3]
Notes payable to banks
9,951,137
10,256,689
11,726,905
12,792,944
Current maturities of
348,708
1,113,218
1,372,543
1,352,724
long term debt
Accounts payable
2,587,432
2,539,672
1,843,430
1,978,905
Accrued liabilities
1,235,628
683,111
863,929
833,084
Advance deposits on bulk
456,478
26,446
product sales
Federal and State incomes
taxes, estimated
Total current liabilities
15,022,905
14,592,690
16,263,203
16,904,121
Long term debt
214,622 [3]
5,110,737
4,461,878
3,292,229
Deferred income taxes
Stockholders equity: Preferred stock
[3]
3,679,900
4,326,200
4,995,200
[4]
[5]
Common stock
200,022 [3]
200,131
208,131
200,131
Additional paid-in
1,320,213
1,333,554
1,333,554
1,333,554
capital
Accumulated earnings
(3,246,016)
(4,381,656)
(6,188,429)
(7,226,267)
(deficit)
Less treasury stock
(16,875)
(16,875)
Total stockholders equity
(1,717,781)
831,929
(345,419)
(714,257)
[3]
$13,519,746
$20,535,356
$20,378,914
$19,562,343
*89 During fiscal 1966 through 1973, St. Paul had the following net income (or loss): 1966
$456,964
1967
84,227
1968
(3,192,212)
1969
(5,802,812)
1970
(3,246,016)
1971
(1,135,640)
1972
(1,806,773)
1973
(1,037,838)
*90 As of December 31, 1968, St. Paul's balance sheet showed a small excess of assets over liabilities.[4]
The following chart reflects St. Paul's cash flow in relation to its debt obligations: ST. PAUL AMMONIA PRODUCTS, INC. Cash Flow vs. Debt Obligations Held By IDI Management, Inc. Years Ended June 30 [1]
1967
1968
1969
Net income (loss)
$ 84,227
[3,192,212)
[5,802,812)
Add charges not requiring funds
(depreciation, amortization, etc.)
1,165,888
2,041,728
2,795,561
Funds from operations (deficit)
1,250,115
(1,150,484)
(3,007,251)
Add proceeds of debt or other
5,168,548
1,248,628
3,438,061
securities
Total funds available
6,418,663
98,144
430,810
Less: Additions to plant and
equipment
5,928,517
522,182
1,458,743
Funds available for debt retirement
490,146
(424,038)
(1,027,933)
Bank loans
170,000
6,436,353
9,451,458
Amount owing IDI Management
5,168,548
4,680,823
5,103,779
*91 1970
1971
Net income (loss)
[3,246,016)
[1,135,640)
Add charges not requiring funds
(depreciation, amortization, etc.)
1,031,421
1,564,587
Funds from operations (deficit)
(2,214,595)
428,947
Add proceeds of debt or other
5,445,710 [2]
10,539,041 [3]
securities
Total funds available
3,231,115
9,681,154
Less: Additions to plant and
equipment
535,442
6,088,759
Funds available for debt retirement
2,695,673
4,450,289
Bank loans
9,951,137
10,256,689
Amount owing IDI Management
900,000 [2]
[3]
Cherokee, whose financial condition was important to IDI not only because of the Cherokee account receivable but also because the O.O.W.A. bonds held *92 by IDI were payable out of Cherokee's lease payments to O.O.W.A., [5] had June 30 fiscal year-end balance sheets for 1968 through 1973 as follows: CHEROKEE NITROGEN COMPANY Balance Sheets As of June 30 [1] (All footnotes not included) ASSETS
1968
1969
1970
Current Assets: Cash
$ 123,727
$ 248,540
$ 153,927
Receivables
Net trade accounts receivable
801,986
1,042,634
459,978
Insurance claims receivable
Other receivables
7,358
13,403
23,471
Total receivables
809,344
1,056,037
483,449
Inventories
Finished and in process
673,376
541,787
530,389
Spare parts
100,000
251,751
276,478
Total Inventories
773,376
793,538
806,867
Prepaid expenses
31,461
143,406
88,977
Total Current Assets
1,737,908
2,241,521
1,533,220
Funds reserved for construction: Cash
Insurance Claims receivable
Property plant & equipment at cost
11,462,082
11,654,301
12,114,030
Less accumulated depreciation
694,783
1,741,982
2,820,214
Net property plant, equipment
10,767,299
9,912,319
9,293,816
Advance to affiliated company
Deferred charges and other costs
less amortization: Plant and product development costs
Start -up and maintenance expense
150,886
119,428
133,021
Other
Total deferred charges & other
costs
150,886
119,428
133,021
Costs in excess of net tangible assets
of acquired business (not amortized)
47,169
66,348
66,348
$12,703,262
$12,339,616
$11,026,405
*93 ASSETS
1971
1972
1973
Current Assets: Cash
$ 108,762
$ 98,300
$ 207,097
Receivables
Net trade accounts receivable
513,211
759,967
483,773
Insurance claims receivable
544,191
Other receivables
18,006
6,480
6,549
Total receivables
531,217
766,447
1,034,513
Inventories
Finished and in process
1,295,904
588,028
110,472
Spare parts
324,555
335,249
353,924
Total Inventories
1,620,459
923,277
464,396
Prepaid expenses
31,158
31,293
29,426
Total Current Assets
2,291,596
1,819,317
1,735,432
Funds reserved for construction: Cash
97,302
Insurance Claims receivable
1,119,234
1,216,536
Property plant & equipment at cost
12,488,796
12,566,740
11,836,832
Less accumulated depreciation
3,764,052
4,729,715
5,204,952
Net property plant, equipment
8,724,744
7,837,025
6,631,910
Advance to affiliated company
82,182
Deferred charges and other costs
less amortization: Plant and product development costs
56,781
Start -up and maintenance expense
117,851
90,236
28,802
Other
8,309
Total deferred charges & other
costs
117,851
90,236
93,892
Costs in excess of net tangible assets
of acquired business (not amortized)
66,348
66,348
66,348
$11,200,539
$9,812,926
$9,826,300
*94 CHEROKEE NITROGEN COMPANY Balance Sheets as of June 30 (All footnotes not included) [1]
Liabilities
1968
1969
1970
Current Liabilities: $
$
$
Current instalments of long term
debt: IDI Management, Inc.
Other
2,000,000
1,222,090
812,707
Notes payable: Banks
1,193,378
1,134,455
Continental Nitrogen and Chemicals
Oklahoma Natural Gas Co.
Accounts Payable
IDI Management, Inc.
37,808
21,429
Other
457,402
673,573
894,229
Accrued Expenses
51,632
58,327
49,425
Total current liabilities
2,509,034
3,185,176
2,912,245
Construction liabilities
Long term debt including
capitalized lease rentals [2]
IDI Management, Inc.
4,000,000
8,850,630
9,209,142
Other
8, 001,724
2,123,992
1,162,993
12,001,724
10,974,622
10,372,135
Less current instalments
2,000,000
1,222,090
812,707
Total Long Term Debt
excluding current instalments
10,001,724
9,752,532
9,559,428
Shareholders equity: Common Stock $10 par value
100,000
100,000
100,000
Additional paid in capital
300,000
664,000 [3]
664,000
Accumulated earnings (deficit)
(207,496)
(1,362,092)
(2,209,268)
Total Shareholders equity
192,504
(598,092)
(1,445,268)
$12,703,262
$12,339,616
$11,206,405
*95 Liabilities
1971
1972
1973 [6]
Current Liabilities: $
$
Current instalments of long term
debt: IDI Management, Inc.
340,290
769,750
Other
506,667
206,104
53,253
Notes payable: Banks
2,096,322
1,165,230
435,008
Continental Nitrogen and Chemicals
12,000
10,500
Oklahoma Natural Gas Co.
93,000
93,000
39,000
Accounts Payable
IDI Management, Inc.
95,321
49,891
48,046
Other
542,942
401,621
274,757
Accrued Expenses
60,921
48,104
66,024
Total current liabilities
3,407,173
2,314,740
1,685,838
Construction liabilities
216,541
Long term debt including
capitalized lease rentals n(2)
IDI Management, Inc.
6,403,130
6,733,130
6,792,750
Other
795,119
523,982
368,896
7,198,249
7,257,112
7,161,646
Less current instalments
506,667
546,394
823,003
Total Long Term Debt
excluding current instalments
6,691,582
6,710,718
6,338,643
Shareholders equity: Common Stock $10 par value
700,000 [4]
700,000
700,000
Additional paid in capital
854,732 [5]
854,732
854,732
Accumulated earnings (deficit)
(452,948)
(767,264)
30,546
Total Shareholders equity
1,101,784 [4]
787,468
1,585,278
$11,200,539
$9,812,926
$9,826,300
*96 During fiscal 1968 through 1973, Cherokee showed the following net income (or loss): 1968
$ (307,479)
1969
(1,054,788)
1970
(847,176)
1971
(452,948)
1972
(314,316)
1973
244,100 [1]
As of December 31, 1968, Cherokee's balance sheet showed that its total liabilities (long-term and current) exceeded its total *97 assets by approximately $291,403. [6]
The following chart shows Cherokee's cash flow in relation to its debt: Cherokee Nitrogen Company Cash Flow vs. Debt Obligations Held by IDI Management, Inc. Years Ended June 30 [5]
1968
1969
1970
Net income (loss)
[307,479)
$ (1,054,788)
$ (847,176)
Add charges not requiring
funds (depreciation, amort-
ization, etc.)
694,783
1,361,210
1,414,262
Funds from operations
387,304
306,422
567,086
Add proceeds of debt or
other securities
n.a.
368,832
Less: Addition to plant
and equipment
n.a.
203,363
459,729
Additional start-up
costs and deferred
items
n.a.
6,241
79,623
Funds available for debt
retirement
n.a.
465,650
27,734
Bank loans and other Notes
1,193,000
1,134,455
Owing IDI Management
Indirectly through Capitalized
Lease Agreement [1]
4,500,000
4,500,000
4,500,000
Directly - construction
Notes
4,000,000
4,000,000
4,000,000
Accrued Interest
709,142 [4]
Total
8,500,000
8,500,000
9,209,142
*98 1971
1972
1973
Net income (loss)
$ (452,948)
$ (314,316)
224,100
Add charges not requiring
funds (depreciation, amort-
ization, etc.)
1,324,633
1,391,213
1,015,761
Funds from operations
871,685
1,076,897
1,239,871
Add proceeds of debt or
other securities
21,673
1,005,271 [3]
Less: Addition to plant
and equipment
374,766
77,944
1,292,931
Additional start-up
costs and deferred
items
74,147
58,958
100,500
Funds available for debt
retirement
422,772
961,668
851,711
Bank loans and other Notes
2,096,322
1,165,230
435,008
Owing IDI Management
Indirectly through Capitalized
Lease Agreement [1]
5,500,000
5,500,000
5,500,000
Directly - construction
Notes
Accrued Interest
903,130
1,233,130
1,292,750
Total
6,403,130 [2]
6,733,130
6,792,750
*99 At the end of 1968, Continental, owning a controlling stock interest in both St. Paul and Cherokee, contemplated a rearrangement of the capital structures of these two companies as well as a third company in which Continental had a controlling interest. This plan, known as "MidAmerica Financing," contemplated the infusion of some $19,000,000 into the three companies from which St. Paul and Cherokee would satisfy their obligations to IDI. By the end of 1968, however, there was no assurance that the MidAmerica Financing could have been completed. Because outside financial interests, who were considering participation in MidAmerica Financing, wanted an independent appraisal of the three companies' economic prospects, Arthur D. Little, Inc., was retained by Continental to investigate their economic outlook. The report dated January, 1969, determined that the supplydemand problem in the nitrogen industry could correct itself by 1971 causing nitrogen prices to recover. Moreover, the report concluded that St. Paul and Cherokee were favorably situated and, with the infusion of new capital, could turn around by 1970.MidAmerica Financing fell through prior to December 31, 1969. *100 In December, 1969, St. Paul's bank creditors advised the company that, because their existing loans were in jeopardy, they were prepared to foreclose.St. Paul's management persuaded the banks to wait at least six months because their net yield from a foreclosure would not be great. The banks consented to St. Paul's continuing operations at least until June 30, 1970. In February, 1970, St. Paul began negotiating for the purchase of an ammonia plant from the Apple River Chemical Company (Apple River Plant), the company from which St. Paul had been buying ammonia. The management of St. Paul saw this acquisition as affording an opportunity to help put the company back on its feet and to ward off foreclosure. The sale was consummated in November, 1970. St. Paul's senior bank creditors were aware of the negotiations but, because any debt that would have been necessary for such purchase would be subordinate to their claims, the purchase did not concern them. The banks never pursued their plan of foreclosure. St. Paul continued to operate and by 1974 was showing a profit. Cherokee, too, remained in operation throughout the years in question and, by 1973, was operating at a profit. *101 On December 31, 1968, petitioner wrotedown the value of the St. Paul notes, the O.O.W.A. bonds, and the Cherokee account receivable in the aggregate amount of $6,220,000 and reported the balance as gross income for that year in respect of its completed contracts, [7] reflecting the estimated fair market value of such obligations ($6,876,202.41). [8] For its 1969 taxable year, petitioner charged off $852,967.95 and claimed a deduction therefor as the portion of the St. Paul and Cherokee obligations it deemed to be worthless. [9] For its 1971 taxable year, petitioner claimed a bad debt deduction in the amount of $580,000 representing the difference between the amount of the Cherokee account previously taken into income (and not previously deducted) and the fair market value of the Cherokee stock petitioner accepted as payment of the account receivable ($920,000). *102 Throughout the years in question, petitioner attempted to avoid becoming too financially involved as an investor in the companies for which it constructed facilities lest it discourage other customers for construction contracts by putting itself in a competitive position with such customers. Other than as previously indicated, the record does not show that petitioner received any payment in respect of the St. Paul obligations or the Cherokee account receivable during the years in question, although it made demands therefor. OPINION Taxable year 1968
The first issue herein involves the amount of income petitioner is required to report for 1968, when it completed its contracts with St. Paul, O.O.W.A., and Cherokee and the fair market values of their obligations to petitioner were significantly less than their face values. Respondent contends that petitioner may not limit the amount includible in income to the fair market values of such obligations because the completed contract method of accounting requires the accrual of the gross contract price (or the face value of the debtor's obligations) in the year the contract is completed. Because this argument was first raised *103 in an amended pleading by respondent, he concedes that he bears the burden of proof in respect of the amount includible in petitioner's income for 1968 from the St. Paul, O.O.W.A., and Cherokee contracts. [10]
If respondent's position is sustained, we must also decide whether petitioner is entitled to any deductions for partial worthlessness of such obligations in 1968 [11] and, in any event, in the subsequent years before *104 us. Initially, we note that there is no express statutory directive in respect of the face versus fair market value controversy herein. Moreover, prior to 1976, respondent's regulations offered no guidance. In T.D. 7397, 1976-1 C.B. 115, however, respondent amended his regulations concerning accounting for long-term contracts and section 1.451-3(d)(1), Income Tax Regs., now provides: under the completed contract method, gross income derived from long-term contracts must be reported by including the gross contract price of each contract in gross income for the taxable year in which such contract is completed * * *. The regulations then go on to carve out exceptions for "disputed" claims. Respondent, however, has not argued that his 1976 regulation should be literally applied and has acknowledged that there is a further exception which recognizes that an item need not be included in income by a taxpayer utilizing the completed contract method of accounting, to the extent *105 that it is "contingent and uncertain" (see National Contracting Co. v. Commissioner,37 B.T.A. 689, 701-702 (1938), affd. 105 F.2d 488 (8th Cir.) 1939)), a phrase which has been redefined as "reasonable uncertainty about the ultimate payment." See Hudson v. Commissioner,11 T.C. 1042, 1050 (1948), affd. per curiam sub nom. Hudson Engineering Corp. v. Commissioner,183 F.2d 180 (5th Cir. 1950). [12] Given respondent's position, we need not reach the issues of whether the regulation should be literally applied or, if so applied, the extent to which it should be given retroactive effect. See section 7805(b). [13]
*106 Respondent contends that on December 31, 1968, there was not reasonable uncertainty that the excess of the face values of the debt obligations of St. Paul, Cherokee, and O.O.W.A. received by petitioner in that year over their fair market values would be collected. [14] Petitioner, on the other hand, takes the position that the fair market values of the obligations (which have been stipulated herein) are determinative of the issue of collectibility. Thus, while petitioner and respondent may agree that uncertain collectibility will justify nonaccrual, the standards for measuring such collectibility propounded by each are clearly distinct. We note, however, that, although fair market value is related to the certainty of payment (or collectibility), the concepts are not "synonymous." See Jones Lumber Co. v. Commissioner,404 F. 2d 764, 767 (6th Cir. 1968), affg. T.C. Memo. 1967-81, and relied upon by this Court in Steele v. Commissioner,T.C. Memo. 1969-177. Accordingly, we reject petitioner's contention that a completed-contract-basis taxpayer necessarily measures its income for the year of completion by the fair market values of its debtor's *107 obligations. We also do not agree with petitioner that this Court has heretofore twice approved the use of fair market value by a completed-contract-basis taxpayer in accounting for debt obligations. In the first case, Hudson v. Commissioner, supra, one of the taxpayers was an engineering company (Engineering) that reported income on the completed contract basis. One contract negotiated by Engineering involved the construction of a processing plant for a fee of $120,000. The company commissioning the processing plant sustained net losses through the year in which the contract was completed; moreover, payment of Engineering's fee was subordinated to a substantial amount of other debt which was secured by a mortgage of all of the debtor company's properties.Engineering received no payment in the year of completion and reported no income in respect of the fee *108 to which it was entitled. Respondent valued the fee at $50,000 for the year of completion and determined that such value was properly includible in Engineering's income. This Court upheld that determination on the ground that Engineering failed to show sufficient uncertainty as to payment of $50,000 to warrant exclusion of that amount as income. See 11 T.C. at 1050. Although we noted that respondent's valuation indicated that he thought there was sufficient uncertainty as to the payment of such amount to excuse the accrual thereof, the issue of the includibility of the remaining $70,000 was simply not before the Court. Consequently, Hudson does not stand for the the proposition that, had the respondent determined that all of the $120,000 fee should have been included in income, this Court would not have sustained that determination. In the second case, American Electric Co., Ltd. v. Commissioner,T.C. Memo. 1966-76, a subcontractor, reporting income on the completed contract basis of accounting, performed services for a general contractor and accepted in payment of such services cash as well as a 6 percent, 25-year debenture of a third party *109 that the general contractor had held, in full satisfaction of the subcontract.The Court sustained the petitioner's inclusion in income for the year in which the subcontract was completed of the cash plus the fair market value of the debenture received. The fact is, however, that the obligation involved was that of a third party, not the debtor, and was received in full satisfaction of the debt. This distinction was emphasized in Steele v. Commissioner,supra, where a homebuilder accepted second mortgages as part payment for homes that he sold and, under the completed contract method of accounting, reported only the fair market values of such mortgages as income in the year of completion. The Court sustained respondent's determination that the taxpayer was required to include in income the face values of such mortgages because they were neither contingent nor uncertain as to collectibility. The receipt of third-party obligations in satisfaction of a debt is quite different from the receipt of obligations of the debtor itself, as is the case herein. In the former situation, the obligations constitute property and a standard of fair market value is an appropriate *110 standard to apply. In the latter situation, the taxpayer is simply receiving evidence of his debtor's continuing obligation in a different form; the right of the creditor to receive full payment of the debtor's obligation remains and, in the case of an accrual or a completed-contract-basis taxpayer, the existence of that right is the critical determinant subject only, in a situation such as involved herein, to the question of collectibility. [14]
Admittedly, in American Electric Co., Ltd., supra, we spoke both in terms *111 of fair market value and proof by the taxpayer of "contingencies or reasonable uncertainties extant in the year of completion in order for taxability of the full amount to be postponed." But even leaving aside the significant element of a third-party obligation, our language does not necessarily make fair market value the test of certainty under any and all circumstances. At most, that case stands for the proposition that we applied a dual test and came to the conclusion that the taxpayer satisfied both criteria. As we see it, the issue herein is a factual one, namely, whether the difference between the face and fair market values of the obligations involved represents an amount sufficiently uncertain as to payment so as to justify petitioner's exclusion of such amount from income. [15] It is to the resolution of that issue that we now direct our attention. In so doing, we are mindful that the term "reasonable uncertainty" should be read narrowly so that the general rule requiring the inclusion of gross contract price in income is not swallowed up by the exception thereto. Cf. Georgia School-Book Depository, Inc. v. Commissioner,1 T.C. 463, 469 (1943). We also *112 understand that mere postponement of, or mere difficulty in making, payment will not suffice to prevent inclusion in income.Cf. Harmont Plaza, Inc. v. Commissioner,64 T.C. 632, 650 (1975), affd. by order 549 F. 2d 414 (6th Cir. 1977). As of December 31, 1968, both St. Paul and Cherokee faced serious financial difficulty. St. Paul had been forced to curtail its costly production of amonia. In 1967, subsequent to its execution of the construction contract with petitioner, St. Paul had to borrow $7,500,000 to service its past due debentures and to provide working capital. The borrowing came about as part of a general plan of refinancing, including its settlement agreement with petitioner whereby petitioner was to receive stock and notes for its contract rather than cash. Moreover, the notes were subordinated to the new $7,500,000 loan and petitioner surrendered its right to file a mechanic's lien against the facilities *113 it constructed. All indications in the record are that petitioner had little choice but to accept the settlement agreement. The contract was not yet completed. Yet, construction could not be halted because the necessary construction materials, which were highly specialized, had been ordered and were in the fabrication process. Cancellation of such orders involved steep penalties.Progress payments were delinquent, although petitioner made demands therefor. Petitioner's treasurer testified that petitioner believed its only hope of realizing any payment was for St. Paul to remain in business and this, in turn, required the borrowing of new capital to which petitioner would have to subordinate its claims. By the end of 1968, St. Paul's situation had worsened rather than improved. Its current liabilities (including its obligations to petitioner) were more than two times its current assets. Although its balance sheet, as of the end of 1968, showed total assets in excess of total liabilities, the assets included the carrying of its plant and equipment at cost. A fair inference from the record is that, given the general state of the industry at the end of 1968 owing in large measure *114 to new entrants with larger, more efficient plants, liquidation of these fixed assets would yield far less than book value. In any event, under the circumstances, we think it was incumbent upon the respondent, who bore the burden of proof, to challenge such inference with evidence to the contrary. This he has not done. Therefore, although St. Paul did not show "balance sheet insolvency" at the close of 1968, it clearly did not have current assets with which to pay petitioner's subordinated claims, and there is real doubt as to whether its total assets could have satisfied any, let alone all, of such claims. [16] Moreover, St. Paul was generating losses and was a part of an industry that was in a severe depression.
*115 As for Cherokee, upon whose financial success petitioner depended for payment of both the O.O.W.A. bonds and the account receivable from Cherokee, the company was insolvent as of December 31, 1968, [17] and its immediate financial outlook was certainly bleak in light of general industry conditions. Petitioner secured two appraisals of the fair market values of the disputed obligations as of the end of 1968 and 1969. These appraisals were supported by the testimony of two experts at the trial. Both appraisals valued the obligations at 50-55 percent of face value as of the close of 1968. Because of the parties' stipulation as to the fair market values of the obligations, our interest in such appraisals turns upon the factors which the experts took into account in determining the fair market values rather than those values as actually *116 determined. Both the testimonial and documentary evidence on this point indicate that collectibility was a key ingredient in determining fair market value, and the ultimate conclusion was that the only market for such obligations would be among speculators or "venture capital investors." We think fair market value can represent a number of things. It can represent a discounted value of a right to receive a sum certain in the future as to which there is no doubt about collection. Or, it can represent more of a "gamble," e.g., the price one is willing to pay for the "chance" to receive a greater sum in the future. Respondent argues that where fair market value is 50 percent or more of a maximum return, "as a matter of practical economics," there must be reasonable prospects of realizing a greater amount. When there is some doubt as to the collectibility of an obligation, which respondent concedes there is here, we agree that such doubt is an element reflected in fair market value. Just as we have rejected petitioner's contention that fair market value is necessarily determinative of collectibility (see p. 34, supra), so do we reject respondent's contention that when fair *117 market value is a certain percentage of face value, ipso facto, there must be insufficient doubt to prevent the inclusion of face value in income. The factors underlying the valuation must be examined. This is particularly true in a situation, such as is involved herein, where respondent, who had the burden of proof, offered no evidence of "marketability" as distinguished from "fair market value". See Underhill v. Commissioner,45 T.C. 489, 494 (1966). The respondent attempts to negate the possibility of a reasonable expectation, as of the end of 1968, that the difference between the face and fair market values of the obligations was uncollectible by pointing to the proposed MidAmerica Financing as well as the Arthur D. Little, Inc., report predicting a turnaround in the fertilizer industry. From the limited evidence we have before us concerning the MidAmerica Financing, we cannot conclude that it was more than a slight possibility already factored into the fair market valuation. [18] In fact, the MidAmerica Financing never did materialize. Although the Arthur D. Little, Inc., report was prepared by independent investigators, its optimism must be tempered by *118 the fact that it was commissioned by Continental in order to attract new capital. Moreover, any specific profit projections for St. Paul and Cherokee presupposed the acquisition of new capital. Because the new capital was anticipated from MidAmerica Financing and because we have already found that the possibility of such financing was slight, the profit picture painted by the report is of questionable reliability herein. We have also had the benefit of testimony from an audit partner in the independent accounting firm certifying petitioner's 1968 financial statement. He testified that he agreed with petitioner's write-down of income for 1968; in fact, he testified that he had sufficient doubts as to the collectibility of the balance, i.e., the writtendown amount of the obligations, and, for that reason, the auditor's opinion as to that amount was qualified to show that *119 the obligations in their entirety were questionable assets. The accountant's judgment was based upon the fact that both companies had current liabilities in excess of current assets, both were experiencing losses, both showed insufficient cash flow with which to service their respective debts, and both had significant other debts to which their obligations to petitioner were subordinated. Petitioner's treasurer also testified that, in both 1968 and 1969, he regarded the debts from St. Paul and Cherokee as being uncollectible. By way of contrast, respondent produced no witnesses to testify affirmatively on the issue, even though he had the burden of proof. Based upon the entire record before us, we conclude that respondent has failed to sustain his burden of proof that there was not a reasonable uncertainty as to the ultimate payment of the portion of the disputed obligations in excess of their December 31, 1968, fair market values and that petitioner may exclude such excess from its income for 1968. [19] We cannot say that petitioner's business judgment was sufficiently lacking in sagacity so as to require petitioner to include the face amount of the obligations in income. Cf. *120 Portland Manufacturing Co. v. Commissioner,56 T.C. 58, 73 (1971).Our disposition of this issue makes it unnecessary for us to reach petitioner's alternative argument as to the partial worthlessness in 1968 of the obligations involved herein (see footnote 11, supra), including respondent's passing contention on brief that the manner of petitioner's chargeoff for 1968 does not satisfy the requirements of section 166(a)(2), a contention which we would, in any event, consider to be of doubtful validity. Taxable year 1969
Petitioner next claims entitlement to a partial bad debt deduction for 1969 in respect of St. Paul's obligations outstanding on December 31 of that year. [20] Petitioner contends that the difference between the face values of such obligations and their fair market values as of the end of 1969 was worthless and deductible to the extent that its bases exceeded such fair market values. The obligations in issue are: Face Value
St. Paul 7% Construction Notes
$4,596,202.41
St. Paul 7% Promissory Notes
507,576.64
Account Receivable from St. Paul
266,690.57
Interest due from St. Paul
244,536.18
*121 At the close of 1969, a plan of recapitalization of St. Paul had been approved by its shareholders and was in the process of being submitted for approval by the necessary percentage of holders of debt obligations (see pp. 7-8, supra). Prior to that time, petitioner had agreed to surrender the St. Paul construction and promissory notes in exchange for 4,203,779 shares of St. Paul common stock and a new 7-percent $900,000 note of St. Paul. The parties have stipulated that as of December 31, 1969, the fair market value of the stock was $840,775.80 and *122 the fair market value of the note was $360,000. While the state of the record is not crystal clear, we think it a fair inference that the parties are in agreement that these values should be used in measuring the petitioner's partially worthless bad debt deduction, if we hold that any such deduction is allowable. The December 31, 1969 fair market values of the account receivable from St. Paul and the interest due from St. Paul were $106,676.23 and $97,814.47, respectively. [21]
By the end of 1969, petitioner had charged off its books the following sums in respect of the St. Paul obligations (see footnote 9, supra): Charge-off
Notes receivable
$5,061,741.26 [22]
(Both construction
and promissory)
Account receivable
266,690.51
Interest due
244,536.18
TOTAL
$5,572,967.95
*123 Such total charge-off exceeds the deductions claimed herein. In his notice of deficiency, respondent disallowed any deduction in respect of the St. Paul obligations on the ground that St. Paul was a continuing business and neither its debts nor its stock could be considered worthless. To the extent that the issue of partial worthlessness is thus posed, petitioner has the burden of proof. However, by amended pleading, respondent asserts that no deduction in respect of the St. Paul notes that were ultimately exchanged, pursuant to the plan of recapitalization, for 4,203,779 shares of St. Paul common stock should be allowed on the additional ground that such recapitalization qualified as a corporate reorganization under section 368(a)(1)(E) and that the notes exchanged by petitioner for stock pursuant thereto constituted "securities" within the meaning of section 354(a). Alternatively, respondent's amended pleading argues for the disallowance of any deduction in respect of such exchange because any "loss" thereon represented a contribution of capital to St. Paul. Respondent concedes that the issues raised in his amended answer constitute new matters as to which he bears the burden *124 of proof. We begin by rejecting respondent's fleeting pitch that petitioner is not entitled to any bad debt deduction in respect of the St. Paul construction and promissory notes for the reason that such notes were, according to respondent, "tantamount to a stock interest or at least a right to subscribe, or to receive stock in St. Paul" and therefore constituted "securities" for which a deduction is allowed under section 165 only in the year of total worthlessness. Respondent's position is not within the scope of the deficiency notice, was not pleaded, was not raised at trial, and is raised on brief only as an afterthought to his argument as to the applicability of the reorganization provisions. It cannot be gainsaid that, prior to the end of 1969, petitioner had agreed to accept St. Paul stock, provided the various other conditions of the recapitalization plan, including the necessary acceptance of other creditors, was forthcoming. Thus, at most, it had a conditional right to stock which would come to fruition only upon the happening of a number of other events beyond the control of either St. Paul or petitioner. Under the foregoing circumstances, assuming that this issue *125 is properly before the Court (as to which we have serious doubts), we are satisfied that the notes in question should be treated as what they appear to be on their face, i.e., debt, and that section 166 applies. We must now decide whether petitioner has satisfied the requirements of section 166(a)(2) [23] in order to take a partial bad debt deduction for 1969. The only requirement therein subject to dispute between the parties is whether the excess over the December 31, 1969 fair market value of the St. Paul obligations (after taking into account, as petitioner concedes, any portion thereof not previously included in income for 1968, see section 1.166-1(e), Income Tax Regs.) was "worthless." This is a question of fact. Respondent correctly notes that section 166(a)(2) confers-- a discretion upon the respondent, which, although not boundless, requires respondent's determination as to deductibility *126 to be upheld unless found to be plainly arbitrary or unreasonable * * *. In attempting to make the required showing it is the taxpayer's burden to introduce evidence which establishes that in the year the partial worthlessness was claimed, the amount of such worthlessness could be predicted with "reasonable certainty." * * * [Sika Chemical Corp. v. Commissioner,64 T.C. 856, 862-63 (1975), affd. without published opinion 538 F.2d 320 (3rd Cir., 1976).] Although the respondent is given greater discretion in the area of partially worthless debts than in the area of wholly worthless debts, such discretion does not include the power to disregard soundly exercised business judgment. Portland Manufacturing Co. v. Commissioner,supra.[24]
If St. Paul's situation was bad at the end of 1968, as we think it was (see pp. 40-42, supra), that characterization could be applied "double in spades" at the end of 1969. By that time, the MidAmerica Financing plan had fallen through. On December 31, 1969, St. Paul was insolvent. Its balance sheet showed *127 liabilities exceeding total assets by $5,250,311. The fixed assets in such balance sheet were carried at cost less depreciation amounting to approximately $9.5 million. At this time, the aggregate face value of St. Paul's subordinated debt to petitioner was approximately $5,107,000. Thus, from the balance sheet figures alone, St. Paul was unable to satisfy any of its debts to petitioner. Petitioner has introduced evidence that matters were far more serious than the books would indicate. Its senior bank creditors threatened foreclosure on December 31, 1969. At that time, St. Paul determined that immediate liquidation would yield total proceeds of only $4,230,000, including $2,000,000 for its fixed assets. Of these proceeds, St. Paul expected only $2,080,000 would be available for its senior bank creditors whom they owed some $9.5 million, leaving petitioner with nothing. Respondent has offered no challenge to the figures presented. If insolvency alone dictated the degree of an obligation's worthlessness, which it does not (see Trinco Industries, Inc. v. Commissioner,22 T.C. 959, 965 (1954); see generally 5 Mertens Law of Federal Income Taxation, sec. *128 30.57 (1975 rev.)), we could conclude St. Paul's obligations to petitioner were wholly worthless. By the same token, we do not accept respondent's contention that the ability of St. Paul to continue as an operating entity automatically precludes any partial worthlessness of its obligations. See Sika Chemical Corp. v. Commissioner,supra. Cf. Riss v. Commissioner,478 F.2d 1160 (8th Cir. 1973); Steadman v. Commissioner,50 T.C. 369, 378 (1968), affd. 424 F.2d 1 (6th Cir. 1970). Moreover, the situation at the close of 1969 was such that St. Paul's prospects of remaining in business were, to say the least, doubtful. Respondent also argues that the plan of recapitalization adopted by St. Paul in November of 1969 and the determination of St. Paul's management to keep the company afloat preclude partial worthlessness. Neither of these factors, however, would seem to have been comforting to petitioner on December 31, 1969, when St. Paul's bank creditors came knocking at its door. Nor do St. Paul's 1970 negotiations for, and eventual purchase of, a new ammonia plant change the outlook as of December 31, 1969, particularly *129 where it appears that such plant was acquired as a "sink or swim" type effort. In addition, both petitioner's own treasurer and its independent accountant testified that they agreed to a write-down of the St. Paul obligations to their estimate of the December 31, 1969, fair market values. Based upon the record as a whole, we conclude that petitioner has carried its heavy burden of proving that St. Paul's obligations to it were partially worthless as of December 31, 1969, to the extent that their face values exceeded their fair market values (after deducting that portion of the face values which we have held was not required to be included in petitioner's income in 1968) and that respondent's denial of such partial worthlessness was unreasonable. [24]
*130 In so finding, we reject respondent's position that the partial worthlessness of that portion of the St. Paul obligations exchangeable for stock pursuant to the plan of recapitalization was in fact a loss suffered on the actual exchange in February, 1970, pursuant to a plan of recapitalization constituting a corporate reorganization within the meaning of section 368(a)(1)(E) [25] and that the obligations surrendered constituted securities for purposes of section 354(a), [26] so that no gain or loss is recognizable on such exchange. As a threshold matter, we assume that St. Paul underwent a statutory recapitalization at least insofar as others exchanged stock or securities for stock. However, *131 petitioner's exchange of notes for stock in February 1970 does not necessarily preclude a partial bad debt deduction for the year ending December 31, 1969. The worthlessness (or partial worthlessness) of a debt and the sale or exchange of such debt are separate and distinct events, provided for separately by the Code. If partial worthlessness is factually established as happening prior to a sale or exchange, two identifiable tax events have occurred. Cf. Levine v. Commissioner,31 T.C. 1121 (1959). This is true even where both such events occur within the same taxable year. Cf. Mitchell v. Commissioner,187 F.2d 706 (2d Cir. 1951), revg. and remanding 13 T.C. 368 (1949). [27] Whether or not the charge-off for worthlessness ought to be integrated with a subsequent sale or exchange or a compromise with the debtor is a factual question. See Levine v. Commissioner, supra.[28]
*132 Although the partial worthlessness claimed herein in respect of the St. Paul notes has been measured in terms of the value petitioner would receive in the subsequent exchange (see p. 50, supra), other factors contributed significantly to our conclusion that the claimed partial worthlessness of St. Paul's obligations in fact existed as of the end of 1969. These other factors have previously been set forth.See pp. 55-58, supra. In evaluating those factors, we have taken into account the effect of the plan of recapitalization that was in the wind. This is all that is required; the fact of the subsequent exchange does not per se preclude the charge-off and the consequent allowable deduction. In view of our conclusion that petitioner's charge-off should not be integrated with the subsequent exchange, we need not determine whether, as respondent contends, the St. Paul construction notes were securities for purposes of section 354 (an issue fraught with ramifications in the area of reorganizations generally) or whether as part of such exchange petitioner made a contribution to the capital of St. Paul and suffered no loss. [29]
*133 Taxable year 1971
The last issue is the amount of petitioner's net operating loss for 1971 which petitioner claims is available for carry-back to the years in issue.On its 1971 return, petitioner claimed a net operating loss of $659,156, of which $580,000 is now in dispute.The amount in dispute relates to a partially worthless bad debt deduction claimed by petitioner in an amended petition in respect of its acceptance, pursuant to the three-party agreement among petitioner, Cherokee, and O.O.W.A., of $1,000,000 in Series B, O.O.W.A. bonds and 60,000 shares of Cherokee stock in satisfaction of the $4,000,000 account receivable from Cherokee (written down by petitioner to $2,500,000 prior to 1971 by virtue of our previous holdings herein (see pp. 47-48, supra)) which petitioner claims was a compromise with its debtor.
Respondent argues that any loss which petitioner suffered on the exchange of $3,000,000 of its account receivable for 60,000 shares of Cherokee stock is not recognizable for tax purposes under section 354(a) because the three-party agreement was in reality a plan of recapitalization of Cherokee which constituted a corporate reorganization within the meaning *134 of section 368(a)(1)(E) and, further, because the account receivable was a "security" which petitioner exchanged for stock. Alternatively, respondent argues that no deduction is warranted because petitioner voluntarily canceled the debt in exchange for stock or because the difference between what petitioner gave up and what it received constituted a contribution to the capital of Cherokee. Unlike the partial worthlessness claimed in respect of the St. Paul obligations at the end of 1969 and prior to the exchange thereof for St. Paul stock, the partial worthlessness claimed by petitioner in respect of the Cherokee account receivable for 1971 is part and parcel of the exchange thereof for Cherokee stock. Whether petitioner realized a loss as a result of such exchange depends upon whether it was a compromise with Cherokee and whether the difference between petitioner's basis in the account receivable and the value of the stock it accepted in satisfaction thereof was worthless. See, generally, 5 Mertens, Law of Federal Income Taxation, sec. 30.36 (1975 rev.). If the transaction with the debtor is more in the nature of a voluntary forgiveness of all or part of the indebtedness, there *135 can be no worthlessness within the meaning of the bad debt provisions. Cf. Lidgerwood Mfg. Co. v. Commissioner,22 T.C. 1152 (1954), affd. 229 F.2d 241 (2d Cir. 1956). Unfortunately, the record before us is simply insufficient to determine the collectibility of the $580,000 difference between the written-down amount of the account receivable ($2,500,000) and the aggregate value of the O.O.W.A. bonds and Cherokee stock ($1,000,000 + $920,000) as of the time of the exchange. [30] We have not been favored with any detailed, independent appraisals of Cherokee's ability to pay the account receivable at the time the stock was received by petitioner. The record merely contains balance sheets and other financial data relating to Cherokee as of June 30, 1970, and June 30, 1971, plus some conclusory testimony. Thus, we cannot find on the record before us that petitioner has carried its burden of proving that it realized a loss as a result of any partial worthlessness of the Cherokee account receivable in 1971. [31]
*136 Even assuming arguendo, however, that petitioner did realize a loss as a result of any partial worthlessness of the Cherokee account receivable, there is a further difficulty with any deduction thereof. Respondent has taken the position that the Cherokee account receivable was a "security" in petitioner's hands and that the exchange of such security for Cherokee stock constituted a recapitalization within the meaning of section 368(a) (1)(E) so that no gain or loss is recognized under section 354. Irrespective of whether said account receivable was a security for purposes of section 354, we think the nonrecognition rules of section 351 effectively preclude any deduction in respect of the exchange. [32]
Section 351(a) provides: General Rule.--No *137 gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately atfer the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property. Control, under section 368(c) means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. From Cherokee's balance sheets, it is apparent that Cherokee had but one class of $10 par common stock. Prior to the issuance of shares to petitioner, 10,000 shares were outstanding. In April, 1971, petitioner exchanged $2,500,000 of the account receivable for 50,000 newly-issued shares of Cherokee and came into control of 83.33 percent of Cherokee's stock. Several months later, petitioner exchanged $500,000 of the account receivable for an additional 10,000 shares giving it 85.71 percent of the stock. *138 Viewed either together or separately, the exchanges satisfied the control test of section 368(c). The critical question, as far as the instant case is concerned, is whether the Cherokee account receivable which was exchanged for Cherokee stock constituted "property" within the meaning of section 351, a term which is broadly construed. See DuPont deNemours & Co. v. United States,471 F.2d 1211, 1218-1219 (Ct. Cl. 1973); H.B. Zachry Co. v. Commissioner,49 T.C. 73, 80, n. 6 (1967). Clearly, an obligation of the corporation issuing stock in satisfaction of its indebtedness can qualify as property under section 351. Duncan v. Commissioner,9 T.C. 468 (1947). Although section 351 does not apply to "stock or securities issued for services," we are satisfied that the Cherokee stock received by petitioner does not fit the mold of this exception. In the first place, the agreements out of which the account receivable arose speak in terms of "acquisition by purchase" and "purchase and sale" of "facilities." Granted that the construction of such facilities involved the rendition of services, the fact of the matter is such services were *139 directed at the creation of the facilities -- property in which petitioner had an interest prior to the transfer to Cherokee. Compare James v. Commissioner,53 T.C. 63 (1969); cf. Roberts Co. v. Commissioner,5 T.C. 1 (1945). Finally, we note that, irrespective of the nature of the original contract, the actual transfer in 1971 involved an account receivable by a taxpayer which had already accrued income in respect thereof. [33]
The account receivable was property in the hands of petitioner and the subsequent exchange thereof for stock was a transfer of property. See Duncan v. Commissioner,supra; see also Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.03 (1971). By the operation of section 351, petitioner recognizes no loss on its transfer and carries over its adjusted basis in the obligation surrendered to the stock received. Section 358. *140 Decision will be entered under Rule 155. Footnotes
1. Prior to the issuance of stock pursuant to the plan of recapitalization, Continental was the shareholder owning the most common stock of St. Paul.↩
2. Cherokee accounted for such lease as a purchase and financing. ↩
3. The amount of the rentals Cherokee was to pay O.O.W.A. under the lease was calculated to be sufficient to amortize the principal and interest owing on the two mortgages and the O.O.W.A. revenue bonds over the term of the lease.↩
1. This receivable is shown as $266,690.91, $266,690.57, and $266,690.51 at various parts of the record. We deem the differences to be immaterial herein.↩
1. Source: Certified financial statements of Peat, Marwick, Mitchell & Co. ↩
4. Cash restricted for application against Demand Notes payable to bank totalled $177,778 in 1968; $466,476 in 1969; $489,256 in 1970; $398,952 in 1971; $637,079 in 1972 $1,269,915 in 1973. ↩
2. Advance on preliminary engineering study for proposed construction. ↩
3. Certification of financial statement by Peat, Marwick, Mitchell & Co. "subject to the continued availability of current borrowing on Demand Notes or the ability of the Company to obtain permanent financing of such indebtedness." ↩
5. Certain items in the 1972 certified financial statement were "reclassified to conform with the 1973 presentation" of the balance sheet in the 1973 Annual Report to stockholders. In 1972 lawsuits were filed against the Company alleging violations of the Minnesota Pollution Control Agency (MPCA) seeking injunctive relief and compensation for damages of $1,000,000 together with punitive damages. The Company estimated $1-2 million costs will be required over a period of years to comply with present standards.↩
1. Source: Certified financial statements prepared by Peat, Marwick, Mitchell & Co. ↩
2. estated is the Company's 1968 Annual Report as $5,168,548 Demand Notes payable to construction company and $4,753,804 Current maturities of long term debt.↩
3. Refelcts Plan of Recapitalization under which $4,203,779 Construction Notes hold by IDI Management Inc., $806,990 Convertible Debentures, $2,000,000 Preferred Stock and $434,940 accrued interest was exchanged for a total of 6,153,347 Common Shares and $7,445,709 contributed to capital. ↩
4. Sowly created Comvertible Proferred Stock issued in payment of notes payable to banks and a construction company $1,735,931, prepaid interest to 6/30/72 on notes payable to banks $544,100, purchase obligation $500,000 and $900,000 Demand Note payable to construction company. ↩
5. Reflects issuance of Convertable Preferred Stock in payment of interest of $646,300 in 1972 and $669,000 in 1973.↩
4. The following summarizes the unaudited balance sheets as of December 31, 1968 and 1969: Assets
12/31/68 Does not reflect $2,081,718 loss on closing ammonia plant during the second fiscal quarter.
[1]↩
12/31/69
Current assets
$ 5,034,280
$ 3,711,797
Net plant and equipment
11,035,082
9,476,440
Other assets
200,546
Intangible assets
97,959
185,390
Total assets
$16,167,321
$13,574,173
Liabilities
Current liabilities
$14,387,760
$18,084,984
Long term debt
1,577,719
739,500
Stockholders equity (deficit)
201,842
(5,250,311)
Total liabilities
$16,167,321
$13,574,173
1. Source: Certified financial statements prepared by Peat, Marwick, Mitchell & Co. ↩
2. Reflects effect of Plan of Recapitalization approved by stockholders under which $806,990 Convertible Debentures, $4,203,779 Construction Notes due IDI Management, and $434,940 accrued interest was exchanged for common stock of the Company. ↩
3. Reflects issuance of $3,679,000 Preferred stock in payment of obligations and accrued interest including $900,000 demand Note payable to IDI Management.↩
5. See footnote 3,supra↩.
1. Source: Audited financial statements prepared by Peat Marwick, Mitchell & Co.↩
1. Source: Audited financial statements prepared by Peat, Marwick, Mitchell & Co. ↩
2. Reflects treatment of lease of plant facilities from Oklahoma Ordnance Works Authority as a purchase. ↩
3. Reflects cancellation by parent of $364,000 Notes Payable to it, and treated as contribution to paid-in capital. ↩
6. On January 17, 1973 a fire and explosion caused substantial damage to plant facilities. As a result, portions of the facilities were inoperative for a period of time during 1973.↩
4. Reflects issuance of 60,000 shares of common stock to IDI Management, Inc. in satisfaction of $3,000,000 indebtedness. ↩
5. Reflects charge to paid-in capital of accumulated deficit as of July 1, 1970 of $2,209,268. ↩
1. Exclusive of extraordinary items (insurance recovery and income tax reduction due to net operating loss carry forward).↩
6. The following summarizes the unaudited balance sheets as of December 31, 1968 and December 31, 1969: ↩
Assets
12/31/68
12/31/69
Current assets
$ 1,625,967
$ 1,934,743
Net plant and equipment
10,296,520
9,575,945
Intangible assets
171,007
192,212
Total assets
$12,093,494
$11,702,900
Liabilities
Current liabilities
$ 2,384,897
$ 3,245,529
Long term debt
10,000,000
9,106,903
Net equity deficit (loss)
(291,403)
(649,532)
Total liabilities
$12,093,494
$11,702,900
5. Source: Certified financial statements prepared by Peat, Marwick, Mitchell & Co.↩
1. Capitalized lease obligation collateralizing bank loan ↩
4. Includes $88,512 other notes ↩
3. Extraordinary items ↩
2. Reflects issuance of 60,000 shares of Cherokee common stock in satisfaction of $3,000,000 obligations owing IDI Management Consists of: Series A Industrial Development Revenue Bonds $4,500,000 Series B Industrial Development Revenue Bonds 1,000,000 ↩
7. ↩
Obligation
Face Value
St. Paul Construction Notes
$4,596,202.41
O.O.W.A. Bonds
4,500,000.00
Cherokee Account Receivable
4,000,000.00
Total
$13,096,202.41
Less Write-Down
6,220,000.00
Income Reported
$ 6,876,202.41
8. The aggregate fair market values of such obligations as of December 31, 1968, has now been stipulated at $7,100,000 (p. 13, supra↩). 9. The deduction for worthlessness represented the decline in estimated fair market value as follows: Difference Between Face Value
and IDI's Estimate of 12/31/69
Item
Fair Market Value
Cherokee account receivable
$1,500,000.00
($4,000,000.)
St. Paul construction and
5,061,741.26
promissory notes
($4,596,202.41 and
$507,576.64)
Accrued interest due from St. Paul
244,536.18
($244,536.18)
St. Paul account receivable
266,690.51
($266,690.51)
Total
$7,072,967.95
Less 1968 Write-off
Excluded from Income
(6,220,000.00)
Claimed Partial Bad
$ 852,967.95
Debt Deduction for 1969
The fair market value of these obligations on December 31, 1969 has now been stipulated as noted on p. 13, supra↩.
10. In its 1968 return, petitioner accrued as income only amounts representing the estimated fair market values of the obligations in question. In his notice of deficiency, respondent challenged those amounts on the ground that petitioner failed to establish that the fair market values of the obligations were less than their face values. The parties have since stipulated the fair market values of the obligations as of the close of 1968 and they are substantially below their face values. (See p. 13, supra.↩) By amendment to his answer to the amended petition, respondent alleged that, under the completed contract method of accounting the obligations were includible in petitioner's income in their "full face amount" rather than their fair market values.
11. The partial bad debt deduction for 1968 is raised by petitioner as an alternative to its position that it need not accrue the face values of the obligations as income for such year.↩
12. See also Steele v. Commissioner,T.C. Memo. 1969-177, which adopts the phrase "uncertain because * * * collectibility was in doubt"; American Electric Co., Ltd. v. Commissioner,T.C. Memo. 1966-76 ("reasonable uncertainty"). Cf. Jones Lumber Co. v. Commissioner,404 F.2d 764, 766 (6th Cir. 1968), affg. T.C. Memo. 1967-81 ("reasonable doubt as to its collectibility" and "doubtful collectibility") Harmont Plaza, Inc. v. Commissioner,64 T.C. 632, 651 (1975), affd. by order 549 F.2d 414↩ (6th Cir. 1977) ("doubtful collectibility"). 13. Unless otherwise stated all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
14. Neither party asks us to decide whether the time for determining reasonable uncertainty should be the date of the receipt of such obligations by petitioner rather than the end of its fiscal year. Under the circumstances herein, we doubt that our conclusion would differ if the former date were used.↩
14. Petitioner's argument that the only difference in tax treatment of an item by an accrual basis, as contrasted with a cash basis, taxpayer is timing and not substantive tax treatment is an oversimplified generalization.For example, an accrual basis taxpayer reports an account receivable when it accrues, and his right to a deduction, when he receives a lesser amount in payment in a later year, is subject to his ability to prove that the amount sought to be deducted is worthless. On the other hand, a cash basis taxpayer reports only the amount which is in fact paid in a later year and is never put to the proof required for a deduction.↩
15. This inquiry may be akin to but not necessarily the same as in evaluating a partially worthless bad debt. See Corn Exchange Bank v. United States,37 F.2d 34, 35 (2nd Cir. 1930). See also footnote 11, supra↩.
16. As of December 31, 1968, total assets exceeded total liabilities by a scant $201,842. Fixed assets were carried at a cost less depreciation in the amount of $11,035,082.We have no specific evidence of the fair market value of such assets. Because of general industry conditions, and the inability of St. Paul's production facilities to operate profitably in the face of competition from newer facilities, it is not unreasonable to infer that book value exceeded fair market value by an amount at least equal to $201,842 plus the $2,596,202.41 that petitioner claims is uncertain as to payment in respect of the St. Paul obligations (face less fair market value). See p. 56, infra,↩ concerning evidence of December 31, 1969, liquidation values of St. Paul's fixed assets.
17. Such insolvency is reflected in Cherokee's balance sheet as of December 31, 1968. Respondent offered no evidence that the balance sheet figures did not reflect an actual excess of liabilities over the fair market value of Cherokee's assets. Indeed we think it fair to infer, as we did in the case of St. Paul, that such was actually the case.↩
18. Indeed, St. Paul's earlier attempts to finance the construction of facilities by petitioner had been unsuccessful even before its rather pronounced financial descent. The unavailability of such financing triggered the need for petitioner to accept stock and notes under the 1967 settlement agreement.↩
19. An adjustment to income is necessary to reflect the fair market values as stipulated by the parties.↩
20. Petitioner also argued conditionally for an additional partial bad debt deduction in respect of Cherokee's obligation to the extent that its basis therein exceeded the December 31, 1969 fair market value. Because of our determination for 1968 that petitioner may report only the fair market value of the obligation in issue as income, petitioner need only report $2,500,000 of the $4,000,000 Cherokee account receivable as income in that year. The maximum write-off claimed by petitioner for this receivable for both 1968 and 1969 is $1,500,000. Hence, no bad debt issue remains for 1969 in respect of the Cherokee obligation.↩
21. Although not clearly indicated in the record, we infer that the promissory notes, account receivable, and interest were taken into income by petitioner during or before its 1969 taxable year. See section 1.166-1(e), Income Tax Regs.↩ In this connection, we note that respondent has not argued that these amounts were not so reported.
22. This amount represents the sum of $4,596,202.41 and $507,576.64, or $5,103,779.05 less $42,037.79 representing petitioner's valuation of the shares of St. Paul stock which it would receive if the plan of recapitalization was consummated. The last figure has now been stipulated at $840,775.80, and the $900,000 construction note, which petitioner determined to be valueless at the time of the charge-off, has now been stipulated at $360,000.↩
23. Section 166(a)(2), as in effect for the taxable year in question, provides: When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.↩
24. See also Harrington v. Commissioner,T.C. Memo. 1972-181↩.
24. Petitioner is entitled to deduct an amount calculated as follows: Face Value of St. Paul Obligations =
$4,596,202.41
266,690.57
244,536.18
$5,107,429.16
Amount Reported as Income (see footnote 21, supra↩)
$2,000,000.00
(construction notes)
507,576.64
(promissory notes)
266,690.57
(account receivable)
244,536.18
(interest)
$3,018,803.39
Less 12/31/69 Fair Market Value
$1,200,755.80
(construction and promissory notes)
106,676.23
(account receivable)
97,814.47
(interest)
($1,405,246.50)
Partial Bad Debt Deduction =
$1,613,556.89
25. Section 368(a)(1)(E) provides: (a) Reorganization.-- (1) In general.--For purposes of parts I and II and this part, the term "reorganization" means- * * * (E) a recapitalization * * * ↩
26. Section 354(a) provides: (a) General Rule.-- (1) In general.--No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation * * *.↩
27. This Court's original position in Mitchell was that a charge-off of a partially worthless debt followed by a sale of the debt to a third party within one taxable year triggered only capital loss on the sale and no bad debt deduction. The court of appeals reversed and stated that if two such separate events occur within one taxable year, the partial bad debt deduction need not be denied. The opinion of the court of appeals has met with subsequent acceptance by this Court. See Levine v. Commissioner,31 T.C. 1121, 1125↩ (1959). 28. Cf. Ardela, Inc. v. Commissioner,T.C. Memo. 1969-83↩.
29. As a result of our decision that the petitioner was entitled to a partially worthless bad debt deduction, separate and apart from the recapitalization, its basis in the obligations of St. Paul surrendered in the February 1970 exchange was reduced to the point where no gain or loss would be realized on the exchange, whether taxable or nontaxable.↩
30. Petitioner actually accepted 50,000 shares of Cherokee stock and O.O.W.A. bonds in partial ($3,500,000) settlement of the account receivable on or about April 15, 1971, and accepted an additional 10,000 shares of Cherokee stock on or about July 30, 1971, in settlement of the remaining balance ($500,000). ↩
31. We recognize that our conclusion differs from that which we reached in respect of the worthlessness of the St. Paul obligations in 1969 (as to which petitioner also had the burden of proof). Such difference merely reflects diverse elements which must be taken into account in a case such as this and evaluated by a trial court. Compare pp. 55-58, supra, where we were able to find partial worthlessness in light of detailed independent appraisals of the debts disputed therein, threatened foreclosure by senior creditors, balance sheets reflecting insolvency at the relevant time estimates of value for assets carried on such balance sheets, etc. See and compare pp. 47-48, supra,↩ where the record did not permit us to find that respondent carried his burden of proving that the collectibility of certain obligations at the end of 1968 was not uncertain.
32. To be sure, respondent did not specifically argue the applicability of section 351, but his contribution to capital argument can be construed as encompassing this issue. Moreoever, the respondent's failure to advance a particular legal theory does not preclude our application of such theory to resolve an issue in his favor. See Smith v. Commissioner,56 T.C. 263, 291↩ and n.17 (1971) and cases cited therein.
33. The reason for eliminating stock issued for services from section 351 was to prevent compensation for services from escaping taxation upon receipt. See H. Rept. No. 1337 to accompany H.R. 8300, 83d Cong., 2d Sess., A117 (1954).↩